### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

MARY NEWELL,
            Plaintiff,

v.

CELADON SECURITY SERVICES,
INC., RODNEY BUTLER, KEITH
GREEN, AND ABEDEKADER
KOUIDRI,
            Defendants.

CIVIL ACTION NO.:
04-10429-JGD

## DEFENDANT CELADON SECURITY SERVICES, INC.'S MOTION FOR
## SUMMARY JUDGMENT ON CLAIMS BY PLAINTIFF MARY NEWELL

Defendant Celadon Security Services, Inc. ("Celadon"), pursuant to Fed. R. Civ.

P. 56(B) and Local Rule 56.1, hereby respectfully moves this Honorable Court for

summary judgment on the claims asserted against it in Counts I through IV in the

Complaint filed by Plaintiff Mary Newell ("Newell").

As grounds therefore, which are more fully set forth in the memorandum of law

filed in support of this motion, Celadon states that Newell's claims are barred as a matter

of law because the undisputed facts establish that the allegedly discriminatory actions

were not perpetrated by any of Newell's superiors, that Newell failed to report any such

harassment to her superiors, and that she voluntarily resigned her position without ever

providing Celadon with any of the facts necessary to conduct an investigation. As a

result, regardless of whether the alleged incident giving rise to these proceedings actually

occurred, Celadon is not liable as a matter of law.

WHEREFORE, based on the undisputed facts, Celadon is entitled to judgment on

all of Newell's claims against it as a matter of law.

Celadon Security Services, Inc.,

By its attorneys,

Edward D. Kutchin, Esq.
BBO No. 281920
Kerry R. Northup, Esq.
BBO No. 633016
Kutchin & Rufo, P.C.
155 Federal Street, 17th Floor
Boston, MA 02110-1727
(617) 542-3000

## REQUEST FOR ORAL ARGUMENT

Celadon believes that oral argument on the subject matter of this motion
will assist the Court in evaluating the merits of same and therefore Celadon wishes to be
heard and hereby requests a hearing for oral argument on the above motion.

Kerry R. Northup

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

On behalf of Defendant Celadon Security Services, Inc., by and through
undersigned counsel, I hereby certify that an attempt was made by undersigned counsel to
attempt to resolve or narrow the issues raised in the above motion, pursuant to Local
Rule 7.1.

Kerry R. Northup

## CERTIFICATE OF SERVICE

I hereby certify that on this date I served a true and correct copy of the foregoing by mailing a copy of same, postage prepaid, to Richard A. Mulhearn, Esquire, Law Offices of Richard A. Mulhearn, 41 Elm Street, Worcester, MA 01609.

Dated: May 31, 2005

Kerry R. Northup

F:\Files\3687\Pleadings\Motion for SJ.doc

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY NEWELL,<br>          Plaintiff,<br><br>v.<br><br>CELADON SECURITY SERVICES,<br>INC., RODNEY BUTLER, KEITH<br>GREEN, AND ABEDEKADER<br>KOUIDRI,<br>          Defendants. | CIVIL ACTION NO.:<br>04-10429-JGD |

DEFENDANT CELADON SECURITY SERVICES, INC.'S MEMORANDUM OF
LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON CLAIMS
BY PLAINTIFF MARY NEWELL

Defendant Celadon Security Services, Inc. ("Celadon"), pursuant to Fed. R. Civ.

P. 56(B) and Local Rule 56.1, hereby respectfully submits this Memorandum of Law in

support of its motion for summary judgment on the claims asserted against it in Counts I

through IV in the Complaint filed by Plaintiff Mary Newell ("Newell").

As argued below, Celadon is entitled to summary judgment on Newell's claims

against it because the undisputed facts establish that (1) the alleged incident underlying

Newell's claims were not perpetrated by Newell's supervisor, and (2) Newell voluntarily

terminated her employment. As a result, Newell cannot prove certain elements essential

to the establishment of her claims. Accordingly, Celadon is entitled to judgment of

dismissal on all of the claims asserted against it as a matter of law.

## I.    STATEMENT OF UNDISPUTED FACTS GERMANE TO THE ISSUES RAISED ON SUMMARY JUDGMENT

Celadon is in the business of providing security services to its clients, specifically by providing security guards to be physically present at Celadon's client's facilities. Celadon employs numerous security guards to assist in providing these services. *Affidavit of Steven T. Zuchowski*, dated May 31, 2005 ("Zuchowski Affidavit"), at ¶ 9 (attached hereto as Exhibit A). Upon their hire, all new Celadon employees are required to acknowledge in writing their receipt of a standard Celadon form of Employment Terms and Conditions (the "Celadon Employment Policies"), which contains Celadon's policies that, among other things, expressly forbids sexual harassment. *Id.* at 3. In accordance with Celadon's hiring requirements, Newell admittedly received and signed the Celadon Employment Policies. First Newell Deposition, dated January 28, 2005 ("*First Newell Deposition*"), at 96-97.

Newell was employed by Celadon from December 11, 2000 to May 18, 2001. During her six months of employment with Celadon, she worked at a number of facilities on Celadon's behalf. One of the facilities to which she was assigned was located at One Kendall Square, Boston (the "OKS Facility"). The OKS Facility is a fairly large facility requiring multiple security guards to be posted there at any given time. On Saturday, May 5, 2001, Newell worked a double-shift at the OKS Facility, first from 8:00 a.m. to 4:00 p.m., and then from 4:00 p.m. to midnight. Another security officer sometimes assigned to the OKS Facility, and specifically assigned to it on May 5, 2001, was co-defendant Abedekader Kouidri ("Kouidri").

According to Newell, another officer at the OKS Facility asked Kouidri to give Newell a tour of the facility, even though Newell had worked at the OKS Facility on

numerous previous occasions. *Deposition of Mary Newell*, dated May 10, 2005 ("Second Newell Deposition"), at 132-34 (relevant portions of the Newell depositions are attached hereto as Exhibit B). As part of the tour, Kouidri allegedly brought Newell to the basement of one of the buildings, kissed her and touched her inappropriately. *Id* at 161-64. Newell told him to let her go, and he did so. *Id*. at 163. Following these events, she returned to her station and did not inform anyone of what had occurred even though other security officers were present on site. *Id*. at 172-174. At the end of her shift, she proceeded home. *Id*.

Newell reported to work at the same facility the next day, Sunday, May 6, 2001, and the following day, Monday, May 7, 2001. *See* Employee Schedule Report, run date July 3, 2001, attached hereto as Exhibit C. On Monday, May 7th, Newell finally reported the sexual harassment to Celadon. *See* Discipline Action Report, dated May 7, 2001, attached hereto as Exhibit D. At the time Celadon received Newell's report, Kouidri was on vacation and he voluntarily resigned at the end of such vacation without responding to Celadon's request to confer with him regarding the incident. *Affidavit of Rodney Butler* ("Butler Affidavit"), at ¶ 8, attached hereto as Exhibit E.

Newell, meanwhile, was assigned to work at Marina Bay in Quincy, a first class condominium complex. She worked there from 5:00 p.m. to 12:00 a.m. (midnight) on the evenings of Tuesday, May 8 through Thursday, May 10. On May 11, 2001, however, mistakenly believing that her shift ended at 12:00 a.m. rather than 1:00 a.m., she was dismayed to find that the transportation home that had been previously agreed to had not arrived. She left the facility prior to the 1:00 a.m. end of her shift and walked home. The following Friday, May 18, 2001, Newell went to Celadon, turned in her uniform and

3

resigned. On that day, Newell signed a standard Celadon Separation Form that indicated that she was resigning of her own accord and affirmed that she had "no claims against Celadon or any of its employees." Separation Form, attached hereto as Exhibit F. Subsequently, Newell filed a claim for discrimination with the Massachusetts Commission Against Discrimination ("MCAD"), which claim was dismissed by the MCAD for lack of probable cause. *See* Dismissal and Notification of Rights, dated September 16, 2003, attached hereto as Exhibit G.

## II.    ARGUMENT

In this action, Newell seeks to hold Celadon vicariously liable for an act of discrimination that was allegedly committed by an individual who was not a supervisor, and who had no prior history of engaging in such conduct. Even accepting, *arguendo*, that Newell's allegations with regard to Kouidri's actions are accurate, Celadon is simply not liable to Newell under either federal or state anti-discrimination laws under these circumstances. Similarly, Newell's allegations of retaliatory conduct simply do not withstand a review of the relevant evidence. As a result, summary judgment should issue in favor of Celadon with respect to all claims asserted against it.

### A.    The Summary Judgment Standard

The standard for ruling on a motion for summary judgment is well established by rule and caselaw. Pursuant to Fed. R. Civ. P. 56(c), "judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an

4

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Fennell v. First Step Designs, Ltd.*, 83 F.3d 526, 535 (1st Cir. 1996), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (emphasis in original); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975). Therefore, in order to avoid the entry of summary judgment, the non-moving party must demonstrate "the existence of a genuine issue of material fact relating to those factual issues on which it would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *see also Moody v. Maine Central Railroad Co.*, 823 F.2d 693, 694 (1st Cir. 1987).

A defendant will succeed on a motion for summary judgment if he "show[s] that there is an absence of evidence in support of at least one element of the plaintiff's case." *Cellco Partnership v. Town of Grafton, Massachusetts*, 336 F.Supp.2d 71, 82 (D.Mass. 2004)(emphasis added). Stated differently, a complete failure of proof on an essential element of the non-moving party's case renders all other facts "immaterial," and mandates summary judgment in favor of the moving party. *Ball v. Wal-Mart, Inc.*, 102 F.Supp.2d 44, 54-55 (D.Mass. 2000); *see also Celotex*, 477 U.S. at 317 (failure of proof concerning an essential element . . . renders all other facts immaterial"). Once a defendant has submitted a properly supported motion for summary judgment, the burden then shifts to the nonmovant, with respect to each issue on which he bears the burden of proof, to demonstrate to the Court that a trier of fact could reasonably rule in his favor. *Sears Roebuck & Co. v. Goldstone & Sudalter*, 128 F.3d 10, 18 (1st Cir. 1997).

B.    Celadon is Not Liable for the Alleged Sexual Harassment Because Kouidri Was Not Newell's Supervisor, and Celadon Could Not Know That He Would Commit Sexual Harassment.

Celadon is not liable to Newell for Kouidri's alleged actions in light of the fact that Kouidri was, like Newell, a security officer with no supervisory authority over **any** Celadon personnel whatsoever. Both Title VII of the Civil Rights Act and Chapter 151B of the Massachusetts General Laws imposes liability for employers of sexually harassed employees under certain circumstances. Caselaw interpreting both statutory schemes, however, hold that an employer is only liable where either (1) the perpetrator was a supervisor of the victim, or (2) for harassment by a co-worker where the employer knew or should have known of the harassment but failed to take reasonable steps to prevent such harassment. Even accepting the facts as alleged by Newell, she has failed to establish a prima facie claim for sexual harassment based on this requirement alone.

        1.    *Elements of a Claim for Sexual Harassment Under Federal and State Law*

Newell has asserted claims against Celadon under both federal and state antidiscrimination laws in connection with Kouidri's alleged actions, and a review of the statutory requirements to establish a prima facie claim under Title VII of the Civil Rights Act and Chapter 151B of the Massachusetts General Laws is therefore required. Title VII of the Civil Rights Act makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-e(a)(1). Subsequent caselaw and Equal Employment Opportunity Commission ("EEOC") guidelines have made it abundantly clear that sexual harassment is prohibited by Title VII. *See*, *e.g.*, *Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986).

6

Similarly, Chapter 151B of the Massachusetts General Laws expressly makes it an

unlawful practice "[f]or an employer, personally or thorough its agents, to sexually harass

any employee." M.G.L. 151B § 4(16A). "Sexual harassment is defined by the statute as

meaning

> "sexual advances, requests for sexual favors, and other verbal or physical
> conduct of a sexual nature when (a) submission to or rejection of such
> advances, requests or conduct is made either explicitly or implicitly a term
> or condition of employment or as a basis for employment decisions; (b)
> such advances, requests or conduct have the purpose or effect of
> unreasonably interfering with an individual's work performance by
> creating an intimidating, hostile, humiliating or sexually offensive work
> environment. Discrimination on the basis of sex shall include, but not be
> limited to, sexual harassment."

Chapter 151B § 1(18).

These two types of sexual harassment in the working environment are generally

referred to as "quid pro quo" harassment and "hostile work environment" harassment,

respectively. Under either type of harassment, Newell's claims must fail for the same

reason – Kouidri was simply not a Celadon supervisor.

### 2.   *Kouidri was Not Newell's Supervisor*

The genesis for an employer's liability for their supervisor's sexual harassment

actions is based on two primary principles – (1) an employer is responsible for the acts of

its supervisors under many areas of the law (i.e. the supervisor is effectively the

employer's agent), and (2) supervisors are aided in their misconduct by the authority

invested in them by the employer. In a case such as this, where the alleged perpetrator

was not, in fact, Newell's supervisor, Celadon may not be held liable due to Newell's

unreasonable and mistaken belief. Here, Celadon did not, in fact, invest any authority

whatsoever in Kouidri and he was therefore neither Celadon's agent, nor was his

misconduct assisted by Celadon's having put him in a position of power relative to other

7

Celadon employees. *Compare, e.g., Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

During the entire course of his employment with Celadon, the perpetrator of the sexual harassment, Kouidri, was a security officer without any supervisory responsibilities whatsoever, either with respect to Newell or any other Celadon personnel. *Zuchowski Affidavit* at ¶¶ 5-6. Celadon's corporate records also clearly indicate that Kouidri's position was co-equal with Newell's. Attached as Exhibit H are Celadon payroll registers for each of Kouidri and Newell, indicating that each were paid at a base rate of $8.50 per hour. During the course of her deposition testimony, Newell indicated that she mistakenly believed Kouidri was her supervisor due to the fact that he was "pushy" and "ordered [her] around . . . telling [her] what to do" during the **single** prior occasion on which they had worked together. *Second Newell Deposition* at 75, 186. Newell also indicated that she believed Kouidri might be her supervisor because he was wearing "street clothes." *Id.* at 77-78. Although Newell could not recall what type of clothing Kouidri was wearing, she indicated that it was neither a security uniform, nor a suit. *Id.* If Newell is correct and Kouidri was not, in fact, wearing his security uniform, then he was in fact in violation of Celadon's employee regulations, which mandate that security officers wear their security uniforms at all times while on duty. *Id.* at ¶ 8. Nevertheless, Newell's mistaken belief regarding Kouidri's status as a supervisor does not transform his actions into creating liability for Celadon. Inasmuch as all Celadon personnel are required to either wear a security uniform or a suit at all times, Newell's mistaken belief that he was her supervisor was unreasonable under the circumstances. *Zuchowski Affidavit* at ¶ 8.

8

Newell's statements regarding whether she believed Kouidri was her supervisor
are completely self-contradictory. As stated above, she indicated that she believed he
was her supervisor because he was wearing "street clothes" (although not a suit), and
because he was "pushy" and apparently attempted to give her orders. Throughout her
deposition testimony, however, she also indicated a clear, and different, understanding
regarding those who held supervisory authority over her. For example, she noted that her
supervisors had specifically informed her that they were her supervisor. *First Newell
Deposition*, at 108-109. She further stated that during her entire tenure at Celadon, she
was only aware of having two supervisors.[1]  *Id.* at 104-105; 110. Meanwhile, she
admitted that Kouidri had never informed her that he was her supervisor.[2]  *Second Newell
Deposition*, at 85. She stated that supervisors wore suits (and not "street clothes", as she
described Kouidri as wearing). *First Newell Deposition*, at 108-109. Newell
acknowledged that she only had two supervisors during her entire tenure at Celadon of
which she was specifically aware. *Second Newell Deposition*, at 27-29. She stated that
one method by which she knew who her supervisors were was whether or not they were

---

[1]  Q: After Rodney became your supervisor, did any other individual ever become your supervisor
other than Rodney by the time you left in May of 2001.

A: No. I don't recall that, no. Rodney was my supervisor.

Q: So would it be fair to say that during the entire time that you were employed at Celadon, you
only had two supervisors.

A: That's who I know. I only knew Mark and Rodney to be my supervisors.

*First Newell Deposition*, at 110.

[2]  Q: Did Abedekader Kouidri ever tell you he was your supervisor?

A: No.

Q: Did you ever ask him if he was your supervisor?

. . .

A: No.

*Second Newell Deposition*, at 85.

9

dressed in security clothes. *First Newell Deposition*, at 109, 111. Specifically, she stated that her supervisors wore "suits." *Id*. She further acknowledged that she "didn't see any supervisor" at the OKS Facility on the date of the incident. *Second Newell Deposition,* at 76. Indeed, the fact that another Celadon employee, wearing security clothes, instructed Kouidri to give Newell a tour of the OKS Facility clearly shows that her belief that Kouidri was her supervisor was simply unreasonable under the circumstances.[3] *Id*. at 79.

In sum, Kouidri was never Newell's supervisor, nor was any belief of Newell's to the contrary reasonable under the circumstances. Newell acknowledged that, unlike her other supervisors, Kouidri never told her that he was her supervisor. She also admitted that she did not see any supervisors at the OKS Facility on the date of the alleged incident. Finally, Newell stated that "supervisors did not wear uniforms", and yet she indicated that she believed Kouidri may have been a supervisor even though he was clearly accepting instructions from an older security guard, who was by her own admission wearing a uniform. *First Newell Deposition*, at 111; *Second Newell Deposition*, at 76-79. The overwhelming evidence is that Newell did not, in fact, believe that any Celadon supervisor was at the OKS Facility on the date in question, and by her own admissions, it is clear that she could not have reasonably believed that Kouidri was

---

[3]    Q: Who told you . . . that [Kouidri] should show you around the building.
   A: It was an older security guard.
   Q: Was he a supervisor, the older security guard, or just another –
   A: I don't know. He had security clothes on, but I don't know was he a supervisor or not, but he had security clothes on. . .
   Q: But he didn't have a suit on, this older gentleman?
   A: No. He had security clothes.
   Q: Security guard outfit?
   A. A security outfit, the older guy that told [Kouidri] to show me around the building.

*Second Newell Deposition*, at 79.

her supervisor. As a result, Celadon may not be held liable under either the federal or state antidiscrimination laws relating to sexual harassment unless Newell is able to establish the much more difficult standard that the employer knew or should have known of the harassment and failed to take reasonable steps to prevent it. *College Town, Div of Interco, Inc. v. Massachusetts Comm'n Against Discrimination*, 508 N.E.2d 587 (Mass. 1987); *Messina v. Araserve, Inc.*, 906 F.Supp. 34, 37-38 (D. Mass. 1995); *Saad v. Stanley Street Treatment & Resources, Inc.*, 1994 WL 846911 (D.Mass. May 20, 1994).

      3.    *Celadon Had No Advanced Warning That This Isolated Incident Would or Could Occur*

Celadon neither could have known nor should have known in advance of the harassment that Kouidri allegedly perpetrated on Newell. Newell has not indicated in either her Complaint or any of the pleadings submitted to date that she worked in an environment conducive to the occurrence of sexual harassment. Newell stated that she had only met Kouidri on one prior occasion. *Second Newell Deposition*, at 72. She has not alleged that Kouidri sexually harassed on her on any occasion prior to the date of the incident. Celadon was not aware of Kouidri having any prior history of committing sexual harassment, nor had Celadon previously received any complaints regarding Kouidri's conduct from any co-worker. *Id.* at ¶ 7. Quite simply, Kouidri's alleged actions occurred without any prior warning whatsoever, and Celadon had absolutely no way of knowing or expecting, in advance, that Kouidri would suddenly assault another security officer. As a result, Celadon is not liable under either federal or state antidiscrimination for an assault on a co-equal employee.

11

### 4.    *Celadon Promptly Undertook to Investigate and Remedy the Situation*

Under Title VII, an employer's prompt remedial actions may serve as a complete bar to liability for harassment committed by a supervisor or co-worker.[4] *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Here, immediately after learning of the alleged incident, Celadon transferred Newell to Marina Bay in Quincy, a first class condominium complex. Kouidri was on vacation at the time, and upon his return he immediately and without notice terminated his employment with Celadon. Celadon took all necessary and reasonable steps possible to remedy the situation. Its investigation was stymied by Newell's failure to meet with her supervisors, and Kouidri's resignation without notice.

### C.    Celadon is Not Liable for Retaliation Because Newell Did Not Suffer an Adverse Employment Action.

Newell has also asserted claims against Celadon, under both federal and state law, for retaliation. Both Title VII and Chapter 151B prohibit employers and their agents from imposing an adverse employment action against an individual who has made a reasonable and good faith complaint regarding wrongful discrimination. Specifically, Chapter 151B § 4(4) makes it unlawful to "discharge, expel or otherwise discriminate" against any person because "he has opposed any practices forbidden under [Chapter 151B] or because he has filed a complaint, testified or assisted in any" anti-discrimination proceeding. Section 4(4A) of Chapter 151B makes it unlawful to "coerce, intimidate, threaten or interfere" with someone "in the exercise or enjoyment of any right granted or protected by [Chapter 151B]." Although federal courts have recognized retaliation as a

---

[4] This is expressly not the case under Chapter 151B. *See, e.g., College-Town, Div. of Interco v. Massachusetts Commission Against Discrimination*, 508 N.E.2d 587 (Mass. 1987).

12

theory of liability, Title VII does not specifically address the matter, and retaliation is instead recognized under Title VII's general prohibition that employers may not discriminate. *See Bain v. City of Springfield*, 678 N.E.2d 155, 160 (Mass. 1997) (discussing the differences between federal and state law with respect to retaliation and noting that because the language in Chapter 151B is "much more specific than Title VII . . . we may well find liability under c. 151B even if the same conduct would not be actionable under Title VII.").

Although Newell's claims with respect to retaliation are somewhat unclear, it appears that she is alleging that being shifted to the Marina Bay facility following the incident in question, and in particular the failure of a supervisor to pick her on the evening of May 11, 2005, operated as a constructive discharge and evidence of retaliatory conduct. A prima facie case of retaliation requires that Newell show that she engaged in protected activity, that Celadon knew she was engaged in a protected activity, that she was subjected to an adverse employment action, and that there is a causal connection between the protected activity and the adverse employment action. An objective review of the evidence clearly indicates that there was, in fact, no adverse employment action taken by Celadon, and therefore Celadon is not liable to Newell for retaliation under either federal or state antidiscrimination laws.

At about the time of the alleged assault by Kouidri, Celadon was responsible for providing security services to approximately 30 separate locations. To adequately staff these facilities, Celadon employed approximately 150 security officers, including Newell. Celadon, of course, could not possibly manage their business without having security officers who are willing to be extremely flexible with regard to their specific facility

security assignments. The importance of this to Celadon is evidenced by the statement in Celadon's standard "Employment Terms and Conditions" form which notes that "I also understand that I am not assigned to any one particular site and at the companies [sic] discretion may be move [sic] at any time." *See* Employment Terms and Conditions, attached hereto as Exhibit I. Newell indicated by signing the Employment Terms and Conditions on December 11, 2000 that she had read and understood the form.

On May 7, 2001, Celadon first learned of the alleged assault by Kouidri on Newell. As an accommodation to Newell, it was determined that she would be reassigned to Marina Bay, a first class condominium complex in Quincy. Because the Marina Bay complex is not easily accessible via public transportation, Celadon agreed to provide transportation to the site before and after her shift even though its policy specifically stated that Celadon is not required to provide transport. Kouidri was on vacation at the time and his immediate resignation upon his return prevented Celadon from either questioning him regarding the events in question, or determining what discipline might be appropriate. Newell worked at the Marina Bay location, without comment or complaint, from Tuesday, May 8 through Thursday, May 10, 2001, and her transport to and from the complex occurred flawlessly. Her shift on such dates was 5:00 p.m. to 12:00 a.m. Newell also reported to the Marina Bay complex in time for her shift at 5:00 p.m. on Friday, May 11, 2001. The Marina Bay complex required security to work until 1:00 a.m., rather than 12:00 a.m., on Friday and Saturday evenings. *Zuchowski Affidavit* at ¶ 12-13; Last Minute Fill-In Reports, weeks of May 5, 2001 and May 12, 2001, attached hereto as Exhibit J. Newell apparently forgot this fact, and became distressed when no one arrived to pick her up at 12:00 a.m. on the evening of

14

Friday, May 11, 2001. According to Newell, she waited approximately 45 minutes and then proceeded to walk home. *Second Newell Deposition*, at 215. This was an abandonment of her post prior to the end of her shift, in violation of Celadon's policies. The following Monday, Rodney Butler, Newell's supervisor, contacted Newell to inquire why she had left her post early. In response, Newell "told [him] that she wanted to resign." *Butler Affidavit*, at ¶ 9. On Friday, May 18, 2001, Newell turned in her uniform and completed a separation form that indicated that she was resigning voluntarily and "had no claims against Celadon or any of its employees." Newell also agreed that Celadon never told her she was terminated, although such a termination would have been justified in light of her abandonment of her post prior to the end of her shift. *Second Newell Deposition*, at 223, 228.

Regardless of whether Celadon called Newell, it is clear that she was not constructively terminated by Celadon, but rather that she voluntarily resigned her employment. First, Celadon's records clearly indicate that Newell's shift at Marina Bay would end at 1:00 a.m. Based on that understanding, Celadon reasonably did not arrange transportation for Newell prior to the 12:45 a.m. time at which she admitted she left the facility. It is also absolutely unreasonable to believe that Celadon would have reassigned her to the Marina Bay facility and provided transportation for three days, only to intentionally fail to pick her up at the end of her shift on the fourth day. Finally, Newell herself signed a separation form that specifically stated that she was voluntarily resigning her position and had no claims against Celadon. For all of these reasons, it is perfectly clear that Newell did not suffer any "adverse employment action" that would have

15

constituted an actionable retaliatory action on Celadon's part under either federal or state antidiscrimination laws.

## III.    CONCLUSION

For the reasons set forth above, Celadon respectfully suggests that Celadon is not liable to Newell in light of the facts that (1) Kouidri was not Newell's supervisor, nor was any belief that he was her supervisor reasonable, and (2) Celadon's actions following the alleged events did not constitute an adverse employment action. Celadon therefore requests that this Honorable Court enter judgment in their favor on Newell's claims against it in Counts I-IV of Newell's Complaint.

Celadon Security Services, Inc.,

By its attorneys,

Edward D. Kutchin, Esq.
BBO No. 281920
Kerry R. Northup, Esq.
BBO No. 633016
Kutchin & Rufo, P.C.
155 Federal Street, 17th Floor
Boston, MA 02110-1727
(617) 542-3000

F:\Files\3687\Pleadings\Memorandum of Law for SJ.doc

16