**Page 1**

Volume 1
Pages 1-141
Exhibits per index

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10429-WGY

- - - - - - - - - - - - - - - - - - :
Mary Newell                         :
         Plaintiff,                 :
v.                                  :
Celadon Security Services           :
Inc., et als                        :
         Defendant.                 :
- - - - - - - - - - - - - - - - - - :

DEPOSITION OF MARY NEWELL, a witness called on behalf of the Defendant, taken pursuant to the Federal Rules of Civil Procedure, before Patricia M. Haynes, a Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, CSR No.: 14620F, at the Offices of Kutchin & Ruffo, 155 Federal Street, Boston, Massachusetts, on Friday, January 28, 2005, commencing at 10:13 a.m.

Copley Court Reporting
101 Tremont Street
Boston, Massachusetts 02108
(617) 423-5841

**Page 2**

APPEARANCES:

Kutchin & Ruffo
(By: Edward D. Kutchin, Esquire)
155 Federal Street
Boston, Massachusetts 02110-2210
Counsel for the Defendant,
Celadon Security Services, Inc.

Law Offices of Richard A. Mulhearn
(By: Richard A. Mulhearn, Esquire)
41 Elm Street
Worcester, Massachusetts 01609
Counsel for the Plaintiff

**Page 3**

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MARY NEWELL | | | | |
| (By Mr. Kutchin) | 4 | | | |

E X H I B I T S

| Exhibit No. | | Page |
|---|---|---|
| 1 | Notice of Taking Deposition | 5 |
| 2 | Medical Record | 10 |
| 3 | Employment Application | 58 |
| 4 | Employment Terms and Conditions | 84 |
| 5 | Document | 96 |
| 6 | Schedule | 97 |
| 7 | Training Verification Sheet | 132 |

**Page 4**

P R O C E E D I N G S

MR. KUTCHIN: It is stipulated by and between counsel for the respective parties that the deposition is to be read and signed under the pains and penalties of perjury, but we are agreeing to waive her having to sign before a notary. Do you want 30 days?

MR. MULHEARN: Yes.

MR. KUTCHIN: All objections, except as to form, and motions to strike are reserved until the time of trial.

MARY NEWELL, having been previously sworn, was examined and testified as follows:

DIRECT EXAMINATION BY MR. KUTCHIN:

Q. Good morning, Ms. Newell.

A. My name is Ed Kutchin. I represent the defendant in this case, Celadon Security Services. I'm going to be asking you a series of questions this morning. You have to audibilize your response, yes or no. You can't just shake your head because she can't put that down on the stenographic transcript.

A. Okay.

## Page 93

1  Q. It's fair to say you did understand that?
2  A. Yes.
3  Q. Is that your signature?
   A. Yes.
   Q. Page six, it says Sexual Harassment
6  Policy of Celadon Services. Did I read that
7  correctly?
8  A. Yes.
9  Q. Do you recall receiving this document at
10 the time that you received this employment terms
11 and conditions?
12 A. I do not recall receiving that, no.
13 Q. Why is that, ma'am, that you don't recall
14 receiving this.
15 A. Mark took me to Lena Park that night. He
16 left fast, and I don't know if he showed me this
17 or not. He took me over there that night. He was
18 trying to get me over there on the shift because
19 there was someone else there. He was waiting for
20 me to get there.
21 Q. *Ma'am, would it be fair to say that in
22 looking at Exhibit 4 entitled Employment Terms and
23 Conditions that of the six pages that this
24 document encompasses there are only two pages as

## Page 94

1  we sit here today that you don't recall seeing at
2  the time that you received this, which would be
3  page four and page six; is that correct?
4      MR. MULHEARN: It's seven pages.
5      (Off the record discussion.)
6      MR. KUTCHIN: Please read back the
7  last question.
8      (*Court reporter reads back noted
9  question as recorded.)
10 BY MR. KUTCHIN:
11 A. Yes.
12 Q. Is your testimony here today based on the
13 fact that page four and page six are the only two
14 pages that don't have your signature on them --
15 A. Page four has my signature on it. Oh.
16 Q. Page four does not have your signature?
17 A. No.
18 Q. Is the reason that you're testifying
19 today that you don't recall seeing these two
   particular pages because they are the only two
   pages out of the total of six that do not have
22 your signature?
23 A. I don't recall seeing them. I don't
24 recall Mark showing me those, going over those

## Page 95

1  with me. The night I went over there with my
2  counselor, he took me over very fast at Lena Park
3  that night. He started me working that night
4  until 9 o'clock.
5  Q. You see, though, on Exhibit 4, the first
6  page, you signed this document on December 11,
7  2000, correct?
8  A. Yes.
9  Q. And is it your testimony as you sit here
10 today that you actually went to work on December
11 11, 2000?
12 A. Yes. When I applied for the job, Mark
13 had me work that night at Lena Park, yes.
14 Q. I'm going to show you a calendar to
15 identify for the record that December 11 would
16 have been a Monday, correct?
17 A. I don't recall the date.
18 Q. But the calendar --
19 A. Yes, Monday.
20 Q. So it's your testimony that on the Monday
21 that you filled out the employment terms and
22 conditions, you then went and actually worked as a
23 security guard at Lena Park for Celadon?
24 A. Yes.

## Page 96

1  Q. So that's your testimony?
2  A. Yes.
3      MR. KUTCHIN: We'll mark this as
4  Exhibit 5.
5      (Document marked for identification
6  as Exhibit No. 5.)
7  BY MR. KUTCHIN:
8  Q. I'm going to show you a document that was
9  marked as defendant's Exhibit 5 for
10 identification. This is a photocopy of a document
11 that I'm holding up the original. Do you recall
12 seeing this at a point in time when you started
13 working for Celadon Security?
14 A. Yeah, I remember seeing that.
15 Q. You do?
16 A. Yeah.
17 Q. On the bottom right-hand corner, do you
18 recognize the signature?
19 A. That's mine at the bottom.
20 Q. Above that, it says, and tell me if I'm
21 reading this correctly, "I, Mary Newell, certify
22 that I have read and understand the Celadon
23 company rules, regulations and company policy and
24 will abide by them," did I read that correctly?

97

1    A.   Yes.
2    Q.   And do you recall that in fact you had
3  read and understood the contents of this Exhibit 5
4  before you signed it?
5    A.   Yes.
6    Q.   You previously indicated to us that you
7  believe that your first day on the job was
8  December 11, correct, and that you went to Lena
9  Park, was that your testimony?
10   A.   **The day that I applied for the job, yes.**
11   Q.   And signed these documents, which is
12 December 11?
13   A.   **Yes, yes.**
14        MR. KUTCHIN:  We'll have this marked.
15        (Document marked for identification
16 as Exhibit No. 6.)
17 BY MR. KUTCHIN:
18   Q.   I'm going to show you a document which
19 has been marked as defendant's Exhibit 6.  Prior
20 to today, do you recall seeing this document?
21   A.   Yes.
22   Q.   What is this, ma'am?
23   A.   **Schedule.**
24   Q.   Would it be fair to say that this Exhibit

98

1  6 records the dates that you worked for Celadon
2  and the location, correct?
3    A.   Yes.
4    Q.   If you look at the first page, the top
5  left corner, it says 12/12/00, Lena Park, correct?
6    A.   Yes.
7    Q.   And would it be fair to say that
8  according to this employee schedule report, the
9  first day that you worked for Celadon was on
10 12/12, 2000?
11   A.   **When I applied for the job, I guess the**
12 **11th Mark took me over to the Lena Park and I**
13 **started working that night.**
14   Q.   Let's look at the calendar.  December 11
15 was a Monday as we previously determined based on
16 the calendar, correct?
17   A.   Yes.
18   Q.   Here 12/12 is a Tuesday?
19   A.   Yes.
20   Q.   Would you like to correct your testimony
21 that in fact the first day you actually worked for
22 Celadon was Tuesday, December 12?
23   A.   **I do not -- I know when I applied for the**
24 **job with Celadon, I know Mark gave me the job**

99

1  right there, and he took me over to Lena Park to
2  work that night.
3    Q.   That night?
4    A.   **That night.  So the date is not down**
5  **here.**
6    Q.   So it's your testimony that you came to
7  Celadon, you filled out the application?
8    A.   Yes.
9    Q.   You filled out the application on
10 December 6, correct?
11   A.   Yes.
12   Q.   And that would have been a Wednesday,
13 December 6.  And that five days later on Monday,
14 December 11, you went back to Celadon and were
15 offered employment, correct?
16   A.   **No.  The first time I went to Celadon to**
17 **apply for the job, I was taken to Lena Park.  He**
18 **took me over there.  He said he had a place for me**
19 **to work.**
20   Q.   But, ma'am, if you can bear with me.  I
21 show you again Exhibit 3.  The middle sheet,
22 that's your signature, right?
23   A.   Yes.
24   Q.   What does it say for a date?

100

1    A.   **12/6/00.**
2    Q.   So it wasn't 12/11, was it, ma'am?
3    A.   **I don't know, I don't recall the dates.**
4  **I don't recall the dates.**
5    Q.   But wouldn't it be fair to say that you
6  would have dated this document the date that you
7  actually signed it?
8    A.   Yes.
9    Q.   And following that logic along, if that's
10 the case, then wouldn't it be fair to say that
11 with the help of your counselor you prepared and
12 signed the employment application on Wednesday,
13 December 6?
14   A.   **Yeah.**
15   Q.   So now we have determined that you signed
16 and submitted the employment application with
17 Celadon on Wednesday, December 6, correct?
18   A.   Yes.
19   Q.   And that subsequent to that on Monday,
20 December 11, you went to Celadon and signed both
21 Exhibit 4, which is employment terms and
22 conditions, and Exhibit 6, which is the employee
23 rules and regulations?
24   A.   Yes.

Page 105

```
1   Lena Park to work until nine.
2       Q.   Do you recall what time you were working
3   till that first night, from when to when?
4       A.   I think it was only three or four hours
5   there or something.
6       Q.   So three or four hours?
7       A.   Yes.
8       Q.   So you're saying after you arrived at
9   Celadon on Monday, December 11, you got a uniform?
10      A.   Yes.
11      Q.   And then did you change into the uniform?
12      A.   Yes.
13      Q.   And then what happened?
14      A.   He drove me over to Lena Park.
15      Q.   And then what did you do at Lena Park?
16      A.   There was a security there before me, and
17  he showed me around the building, what to do in
18  the building to show me what to do when I'm there
19  by myself. And he showed me how to put the alarm
20  on when I'm leaving. He gave me the code to the
21  alarm. When I'm leaving, I have to put the alarm
22  on. He was showing me that.
23      Q.   So you were at a particular post at Lena
24  Park?
```

Page 106

```
1       A.   I was at Lena Park, yes.
2       Q.   At a particular security post?
3       A.   Yes. In front of the door.
4       Q.   And how many Celadon employees were at
5   the security post there?
6       A.   There was only one when I got there.
7       Q.   And was this person a fellow security
8   officer or was this person a supervisor?
9       A.   I think it was a security guard.
10      Q.   Who had the same responsibilities as you?
11      A.   Yes.
12      Q.   Was it the security guard who showed you
13  what to do at this particular post?
14      A.   Yes.
15      Q.   Did he show you around?
16      A.   Yes.
17      Q.   How much time did the security guard
18  spend with you that night?
19      A.   I do not recall, I don't recall.
20      Q.   Was it five minutes?
21      A.   It was more than that. He had to show me
22  the alarm, how to put the code in the alarm. And
23  when he was leaving, I used to put the alarm on
24  the door and he showed me the code of how to put
```

Page 107

```
1   the code in there. The place was not a big place,
2   it was a small. I was working on the first floor.
3       Q.   So as you sit here today, approximately
4   how much time did he spend with you showing you
5   these different things?
6       A.   About half an hour.
7       Q.   And then what did he do?
8       A.   I don't remember what he did after that.
9   I sat on the chair there, but I didn't see where
10  he went after that.
11      Q.   And do you recall what this gentleman's
12  name was?
13      A.   No, I don't.
14      Q.   You have no idea?
15      A.   No. I never saw him before.
16      Q.   When you first started working at
17  Celadon, do you recall if you had a supervisor who
18  you reported to?
19      A.   At the beginning, it was Mark.
20      Q.   At the beginning?
21      A.   At the beginning, yes.
22      Q.   In the time frame that you were there
23  between December of 2000 and May of 2001,
24  approximately five months, did it change at any
```

Page 108

```
1   point in time?
2       A.   I got a new supervisor, yes.
3       Q.   Who was that?
4       A.   Rodney Butler.
5       Q.   When did Rodney become your supervisor?
6       A.   Rodney Butler became my supervisor when I
7   was, after Watertown.
8       Q.   Would it be fair to say it was sometime
9   in January of 2001?
10      A.   I don't recall when I went to Watertown.
11  After Watertown, Rodney Butler was my supervisor,
12  so I was working in Horizon East in Watertown.
13      Q.   When Mark Gangone was your supervisor --
14  your testimony that Mark Gangone was your initial
15  supervisor when you came to work at Celadon?
16      A.   Yes.
17      Q.   How did you know that Mark was your
18  supervisor?
19      A.   He told me he was the supervisor.
20      Q.   He told you?
21      A.   Yes.
22      Q.   And what did it mean to you that he was
23  your supervisor?
24      A.   What did it mean to me? He was my boss.
```

109

1  Q. As your boss, what did that mean?
2  A. **He gave me the job. He told me where to**
3  **go for security. He took me to Watertown to work.**
4  **Then after Watertown, I worked other places. But**
5  **Mark was not my supervisor after I left Watertown.**
6  **Rodney Butler was my supervisor then.**
7  Q. How did you know Rodney was your
8  supervisor?
9  A. **He told me he was the supervisor.**
10 Q. So Rodney told you he was your
11 supervisor?
12 A. **Yes.**
13 Q. And --
14 A. **And he was not dressed in security**
15 **clothes, so I knew he was a supervisor because he**
16 **didn't have the security clothes on.**
17 Q. What kind of an outfit did Mark have?
18 A. **He didn't have, he had the suit like**
19 **Rodney.**
20 Q. So that's how you knew that these two
21 individuals were supervisors?
22 A. **And they told me.**
23 Q. And also based on what they wore, too?
24 A. **Yes.**

110

1  Q. After Rodney became your supervisor, did
2  any other individual ever become your supervisor
3  other than Rodney by the time you left in May of
4  2001?
5  A. **No. I don't recall that, no. Rodney was**
6  **my supervisor.**
7  Q. So would it be fair to say that during
8  the entire time that you were employed at Celadon,
9  you only had two supervisors?
10 A. **That's who I know. I only knew Mark and**
11 **Rodney to be my supervisors.**
12 Q. So there was nobody else that was ever
13 your supervisor while you were employed at
14 Celadon, correct?
15 A. **No. They are the ones that gave me the**
16 **jobs and would tell me where to go. And they are**
17 **the ones that call me at my house to let me know**
18 **where to go to work.**
19 Q. And they are the ones who directed you in
   terms of doing your job?
   A. Yes.
22 Q. But they also directed you as how to do
23 your job and what to do in your job?
24 A. Yes.

111

1  Q. And unlike a security guard, they did not
2  wear a security guard uniform?
3  A. **No, no. They wear a suit.**
4  Q. Do you know if any supervisors ever wore
5  security guard uniforms?
6  A. **Yes, they did.**
7  Q. They did?
8  A. **Yes.**
9  Q. How do you know that, that a supervisor
10 would wear a security guard --
11 A. **No, no. Supervisors did not wear**
12 **uniforms.**
13 Q. Only security guards?
14 A. **Yes, like me, wore the uniform. Mark and**
15 **Rodney didn't have security clothes on.**
16 Q. Exhibit 6, as we already established, is
17 the employee schedule report where you apparently
18 worked throughout your tenure at Celadon, correct?
19 A. **Ten years?**
20 Q. Let me rephrase it.
21 A. **I thought you said ten years.**
22 Q. I'm going to ask you to look at the
23 employee schedule report, Exhibit 6. My question
24 to you is, does this list the dates and places

112

1  where you acted as a security guard throughout the
2  time that you were employed at Celadon?
3  A. **It says the dates here, but I'm not sure**
4  **if those are the right dates. I did work at Lena**
5  **Park. I worked in Horizon East Condominiums.**
6  Q. *Do you have any information which you
7  could tell us about which would indicate that this
8  report is incorrect in any way?
9  A. **Okay.**
10 Q. Have you had an opportunity to look at
11 that?
12 A. **Yes.**
13     MR. KUTCHIN: Please read back the
14 last question.
15     (*Court reporter reads back noted
16 question as recorded.)
17 BY MR. KUTCHIN:
18 A. **I don't know, because I don't remember**
19 **the dates that I worked. I know I went to work at**
20 **Lena Park with Mark on the 11th, but it's not down**
21 **here. I was working at Lena Park and I was**
22 **working Horizon East Condominiums, but I don't**
23 **know exactly what date I went to Horizon East**
24 **Condominiums.**

## Page 1

```
VOLUME: II
PAGES: 1 through 242
EXHIBITS: See Index

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

****************************
MARY NEWELL,           )
         Plaintiff,   )
                      )  Civil Action
   vs.                )  No. 04-10429-JGD
                      )
CELADON SECURITY SERVICES, )
INC., RODNEY BUTLER, KEITH )
GREEN AND ABEDEKADER KOUIDRI, )
         Defendants.  )
****************************

        CONTINUED DEPOSITION OF MARY NEWELL,
a witness called on behalf of the Defendants,
taken pursuant to the provisions of the Federal
Rules of Civil Procedure, before Kathleen M.
McHugh, a Registered Professional/Certified
Shorthand Reporter (#120093) and Notary Public
in and for the Commonwealth of Massachusetts, at
the offices of Kutchin & Rufo, P.C., 155 Federal
Street, Boston, Massachusetts, on Tuesday, May 10,
2005, commencing at 10:05 a.m.

             COPLEY COURT REPORTING
               101 Tremont Street
             Boston, Massachusetts 02108
                  (617) 423-5841
```

## Page 2

```
APPEARANCES:

LAW OFFICES OF RICHARD A. MULHEARN
(By: Richard A. Mulhearn, Esquire)
41 Elm Street
Worcester, Massachusetts 01609
Counsel for the Plaintiff

KUTCHIN & RUFO, P.C.
(By: Edward D. Kutchin, Esquire)
155 Federal Street
Boston, Massachusetts 02110
Counsel for the Defendant

ALSO PRESENT:

Steven T. Zuchowski
```

## Page 3

```
                I N D E X
Witness                          Direct
MARY NEWELL
  (By Mr. Kutchin)                  5

                E X H I B I T S
Exhibit No.                                Page
   8    Complaint and Claim for
        Jury Trial, dated 2/29/04,
        consisting of nine pages.           53
   9    Diagram.                           109
  10    MCAD Charge of Discrimination,
        dated 5/31/01, consisting of
        two pages.                         176
  11    Disciplinary Action Report,
        dated 5/7/01.                      176
  12    Separation Form, dated 5/18/01.    176
```

## Page 4

    STIPULATIONS
        MR. KUTCHIN: Richard, same
stipulations?
        It is stipulated by and between counsel
for the respective parties that the deposition
is to be read and signed under the pains and
penalties of perjury, but we are agreeing to
waive her having to sign before a notary. All
objections except as to form and motions to strike
are reserved until the time of trial.
        MR. MULHEARN: Yes, with the
exception that she's going to read and sign, but
she'll make arrangements with the Reporter.
        MR. KUTCHIN: Okay, so the previous
stipulations. Do you want 30 days?
        MR. MULHEARN: Yes.
        MARY NEWELL, appears before us today
for her deposition. This witness does not at
present have adequate documentation attesting to
her identity that satisfies the standards required
by the State of Massachusetts for Notaries Public
in administering oaths.
        The parties in this action therefore
agree to hold harmless this Notary Public if this

## Page 5

witness is later discovered to have falsified her
identity.
        The witness was duly sworn by the
Notary Public and testified as follows in answer
to further direct interrogatories by Mr. Kutchin:
    Q.  Good morning, Ms. Newell.
    A.  Good morning.
    Q.  As you recall, my name is Edward
Kutchin. I represent the Defendant, Celadon
Security Services, in this matter. You have to
acknowledge yes or no.
    A.  Yes, yes.
    Q.  And I'm going to be asking you a series
of questions like I did last time, okay?
    A.  Okay.
    Q.  In the event you would like to take a
break or confer with your counsel, please ask me
and we'll be more than glad to accommodate your
wishes.
    A.  Okay.
        MR. MULHEARN: Before we get started,
Ed, my client informed me today and she had
mentioned it, I guess, once before, that with
regard to her ability to read and understand

## Page 6

English, her native language is Gaelic.
Apparently she speaks this still.
        She's expressed some concern about
being able to understand everything asked or if
something is put in front of her actually being
able to understand completely the English,
whatever.
        I mean, I'm comfortable enough with
what I perceive to be her ability to understand
English, to proceed without, say, an interpreter
here, but there may be -- I've asked her to
indicate to you when it is she has some difficulty
understanding what she's being asked. I think we
can handle it that way, if you're acceptable to
that.
        MR. KUTCHIN: That's fine. Again,
like you, I'm a little surprised at that. She
seemed to have perfect command of all the
questions that I asked, and, again, I know your
counsel wouldn't do this, but I don't want that
to be a way to try to avoid the impact of the
questions that I did ask.
        THE WITNESS: There's a lot that I
don't understand English. English is not my first

Page 25

1  Q. Do you remember what kind of questions?
2  A. What kind of questions?
3  Q. That she asks you?
4  A. I don't remember. Anything she asks
5  me, I answer it.
6  Q. And you see her every two weeks and you
7  can't recall her name?
8  A. I know her name is Judith, but I don't
9  know her last name because it's very difficult to
10 say.
11 Q. Can you spell it?
12 A. No. It's a long name. I don't know.
13 I don't know. I'm sorry. I don't know. It's a
14 long --
15 Q. Do you have a card of hers?
16 A. No, no. I don't have my wallet, no. I
17 had it at home.
18 Q. Now, ma'am, during the last deposition,
19 we discussed who your supervisor had been during
20 your tenure at Celadon, correct?
21 A. Yes.
22 Q. Do you recall that?
23 A. Yes.
24 Q. Because you were at Celadon between

Page 26

1  December of 2000 and May of 2001?
2  A. Yes.
3  Q. For approximately five months, correct?
4  A. Yes, about that time, yes.
5  Q. And I think your testimony was
6  initially your supervisor was Mark Gangone?
7  A. That's the one that hired me, yes.
8  Q. And he was your supervisor when you
9  started working for Celadon; is that correct?
10 A. At the beginning, yes.
11 Q. And then you -- you say at the
12 beginning. Then who became your supervisor?
13 A. That was Rod --
14 Q. Rodney Butler?
15 A. Yes.
16 Q. Okay. Other than those two, I think
17 your testimony was you didn't have any other
18 supervisors, correct?
19 A. There was -- I -- I don't know who the
20 supervisor was. I know Rodney and Mark was the
21 supervisor, but there was a lot of supervisors.
22 Q. But, your supervisors, who did you --
23 who supervised you in terms of your work while you
24 were employed at Celadon other than these two

Page 27

1  gentlemen?
2  A. Mark and Rodney.
3  Q. But anybody else?
4  A. I don't remember.
5  Q. You don't remember or there was no
6  other supervisors that you reported to?
7  A. Everybody that called me and talked to
8  me about the jobs was Mark and Rodney.
9  Q. Just so we're on the same wavelength,
10 ma'am --
11 A. I'm sorry.
12 Q. -- once you became employed by
13 Celadon --
14 A. Yes.
15 Q. You have to let me finish, please.
16 A. I'm sorry.
17 Q. No problem. Once you became employed
18 by Celadon, you had a supervisor who directed what
19 you did, correct?
20 A. (Witness nods head.)
21 Q. You have to say yes or no.
22 A. Yes, yes, yes.
23 Q. Then my question was during the
24 approximate five-month period of time when you

Page 28

1  were at Celadon, you had two supervisors that
2  directed you as to what to do for your job and how
3  to do it, correct?
4  A. Yes.
5  Q. And that was Mark Gangone,
6  G-a-n-g-o-n-e, initially, correct?
7  A. Yes.
8  Q. And then Rodney Butler?
9  A. Yes.
10 Q. Correct?
11 A. Yes.
12 Q. And other than that, you did not have
13 any other supervisor that directed you, correct?
14 A. No, I don't remember, no.
15 Q. No, correct?
16 A. No, no.
17 Q. There were no other supervisors?
18 A. No, no.
19 Q. Okay.
20 A. But there was a lot of people that
21 wasn't dressed in security clothes, so I don't
22 know if they were the supervisor or not.
23 Q. But at any time --
24 A. Rodney wasn't dressed in security

Page 29

1  clothes and Mark wasn't dressed in security
2  clothes and they're the ones that was my
3  supervisor, that I thought was my supervisor,
4  because they're the ones -- they used to call me
5  and tell me to go here and tell me to go to the
6  next job the next day to condominiums, and I
7  remember Rodney called me at 12:00 one night and
8  he told me to go to condominiums on Park Street
9  because the boss -- the boss there had to go to
10 the hospital with his son and he couldn't be there
11 and he asked me would I go there the next morning
12 and I said yeah so...
13 Q. So then other than these two
14 individuals, Mark and Rodney, was there anybody
15 else while you were employed by Celadon that
16 either called -- that called you --
17 A. No, no, no.
18 Q. And was there anybody else while you
19 were employed by Celadon that told you which
20 location to go to to perform security services?
21 A. Which locations, no.
22 Q. Just those two, correct?
23 A. Just those two, yes, yes.
24 Q. Okay. Now, I'm going to show you what

Page 30

1  has previously been marked as Exhibit No. 7 which
2  I recall you previously stated was the document
3  that indicated what your schedule was during the
4  time frame that you were employed at Celadon.
5     Do you recall that, ma'am?
6  A. No.
7  Q. You do not?
8  A. No.
9  Q. Okay. I'm going to show you -- if you
10 can direct your attention to page 116 --
11 A. 116?
12 Q. Yes, ma'am. If you could please look
13 at Line 10 through Line 22 and just read that to
14 yourself, please. Just tell me when you've
15 completed reading it.
16    MR. MULHEARN: You're indicating at
17 Line 12 there's a word -- definitely is the word.
18    THE WITNESS: Definitely.
19    MR. MULHEARN: Definitely,
20 particular.
21 Q. Did you have a chance to read that,
22 ma'am?
23 A. Yeah, but I don't understand it.
24 Q. You don't understand it?

Page 67

1 weren't paid?
2   A. I didn't -- I didn't check that out. I
3 mean, they gave me a check every -- every week,
4 but I didn't look at the hours I was working and I
5 didn't look how much I was getting. I just got
6 the check and I cashed it. That's all.
7   Q. Well, did you not look at the check
8 because you assumed that they were paying you for
9 the hours you worked?
10   A. Yes. I trust them that they would pay
11 me for the hours that I did work, yes.
12   Q. Did they ever do anything to you in
13 terms of not paying you which would then make you
14 not trust them?
15   A. No. I said I trust them.
16   Q. You trust them?
17   A. Yes.
18   Q. So maybe to speed things up I'm going
19 to identify --
20       MR. KUTCHIN: If it's all right with
21 you, Richard --
22   Q. -- just so we can go through this,
23 other dates that you worked at One Kendall Square
24 that are indicated on Exhibit 6, okay, and I'm

Page 68

1 going to assume based upon your prior testimony
2 that you don't have any memory of these dates.
3 I'm going to ask you to look at --
4   A. But I did work weekends at One Kendall
5 Square.
6       MR. MULHEARN: It's on the record.
7   Q. It's on the record, but you also told
8 us you can't identify specific dates, correct?
9   A. Those dates I can, yes.
10   Q. April 8th, 2001, do you recall that
11 date?
12   A. I don't remember.
13       MR. MULHEARN: It's a yes or no.
14   Q. Yes or no?
15   A. No.
16   Q. April 14th, 2001, do you recall?
17   A. That was on a Friday.
18       MR. MULHEARN: Saturday.
19   A. Saturday. I don't remember the dates.
20   Q. April 15th, 2001 which was a Sunday?
21   A. I know I did work a lot at One Kendall
22 Square, yes.
23   Q. No, ma'am. That wasn't the question.
24 Do you recall providing security guard services

Page 69

1 on Sunday, April 15th, at One Kendall Square,
2 starting at 8:00 a.m.?
3   A. I don't remember the dates, but I was
4 there.
5   Q. Ma'am, do you recall providing security
6 guard services at One Kendall Square on Saturday,
7 April 21, beginning at 8:00 a.m.?
8       MR. MULHEARN: Okay. You have to
9 answer.
10   A. I don't remember the dates.
11   Q. You don't remember.
12       MR. MULHEARN: He's just for the
13 record doing this.
14       THE WITNESS: Yes, yes. I know I
15 worked a lot at One Kendall Square.
16       MR. MULHEARN: We already got that.
17   Q. April 22nd, 2001, which is a Sunday, do
18 you recall working at One Kendall Square beginning
19 at 8:00 a.m.?
20   A. I don't remember the dates.
21   Q. Now, I'm going to refer you to April
22 28th which was a Saturday. Do you recall actually
23 working a double shift on April 28th, starting at
24 8:00 a.m. and then continuing on past 4:00 p.m. to

Page 70

1 12 midnight?
2   A. I did work a double shift, but I don't
3 know that that was the date. I don't know the
4 dates.
5   Q. All right. Do you recall whether on
6 April 25th, when Exhibit 6 shows that you worked a
7 double shift, that at 4:00 p.m. Abedekader Kouidri
8 came on to work with you at One Kendall Square?
9   A. The supervisor showed him -- told him
10 to show me around the building, but I don't know
11 what date that was.
12   Q. Okay.
13   A. I don't remember what date that was.
14   Q. Okay.
15   A. But he did work with me one night
16 there, but the security that was working there
17 told him to show me around the building and tell
18 me -- show me what to do in case I'd be working
19 alone again so I'd know what to do by myself.
20       MR. MULHEARN: You were asked a yes
21 or no question. Do you remember if he worked with
22 you?
23   A. I don't remember.
24   Q. So you don't remember if he worked with

Page 71

1 you on April 28th?
2   A. I know he worked with me, but I don't
3 know the date.
4   Q. Do you remember how many times he
5 worked with you during your tenure at Celadon?
6   A. He only -- he only showed me around the
7 building once.
8   Q. No, no. That wasn't the question,
9 ma'am. While you were employed by Celadon for
10 approximately five months, how many times did you
11 see Abedekader Kouidri at the same site that you
12 were working?
13   A. I don't remember.
14   Q. Well, was it more than once?
15   A. More than once, there was so many
16 people working there.
17   Q. You don't remember more than once,
18 ma'am?
19   A. I think he was there more than once,
20 yes.
21   Q. When you were at the same site,
22 correct?
23   A. Yes, yes.
24   Q. And, in fact, it was more than three

Page 72

1 times, wasn't it, ma'am?
2   A. No, no, it wasn't.
3   Q. How many times was it then that you saw
4 Abedekader Kouidri at the same --
5   A. I think I saw him --
6   Q. Excuse me -- at the same site that you
7 were working at prior to -- prior to the date that
8 you say he harassed you?
9   A. He was -- he was there about once and
10 he was pushing me around and he was -- he was -- I
11 thought he was the supervisor because he was very
12 pushy with me.
13       MR. MULHEARN: He just said how many
14 times.
15   A. I think I saw him once before that.
16       MR. MULHEARN: Okay.
17   A. But I don't know if he was working
18 there before that because the security told him to
19 show me --
20       MR. MULHEARN: You've answered the
21 question.
22   Q. Now, I want to see if I understand
23 this. So you're telling us as we sit here today
24 that at least once prior to the date you allege

### Page 73

1 that this gentleman sexually harassed you you
2 saw him at a Celadon -- at a site where Celadon
3 Security was providing security services,
4 correct? Is that your testimony?
5   A. I'm sorry. What did you say?
6     MR. KUTCHIN: Can you read that back,
7 please, Kathy?
8     (The question was read by the
9 Reporter.)
10   A. Yeah, I think I saw him once.
11   Q. At least once?
12   A. Yes.
13   Q. In fact, wasn't it more than once that
14 you saw him prior to him --
15   A. I do not --
16   Q. Excuse me. You have to let me finish,
17 please.
18   A. Okay. I'm sorry.
19   Q. Isn't it true that you saw him at least
20 three or four times prior to the date that you
21 allege that he sexually harassed you?
22   A. I do not remember.
23   Q. You don't remember?
24   A. I saw him once before he sexually

### Page 74

1 harassed me because somebody -- the security --
2     MR. MULHEARN: You don't have to
3 explain. The question is --
4   A. I don't -- okay.
5   Q. How do you know that you saw him at
6 least once prior to the date that he allegedly
7 sexually harassed you?
8   A. How do I know?
9   Q. Yes. How do you know?
10   A. Because he was very pushy with me. He
11 was ordering me around all over the place and he
12 was very pushy. I thought he was the supervisor.
13   Q. Do you recall when that was?
14   A. I don't remember when that was. That
15 was before that he took me around the building and
16 sexually harassed me.
17   Q. That was before that date?
18   A. Yes, yes.
19   Q. So you --
20   A. But I don't know the dates though.
21   Q. You don't know the dates?
22   A. No, no.
23   Q. But you and he --
24   A. I know I was sexually harassed the

### Page 75

1 beginning of May, so that would be May 5th or
2 something the beginning of May.
3   Q. But this episode took place before
4 that, correct, when he -- when you first met him,
5 you said?
6   A. He was very pushy with me.
7   Q. But when was that, ma'am, prior to the
8 date that he sexually harassed you?
9   A. No. That was before he sexually
10 harassed me.
11   Q. So it was prior to the date that he
12 sexually harassed you and did this -- strike
13 that.
14     Did your meeting him take place at One
15 Kendall Square?
16   A. Meeting him?
17   Q. The first time?
18   A. Yeah.
19   Q. It took place at One Kendall Square?
20   A. Yes. I never -- yes.
21   Q. You said he was very pushy with me?
22   A. Yeah, he was ordering me around. He
23 was telling me what to do. If I got off the
24 chair, he yelled at me and said you're not

### Page 76

1 supposed to get off the chair. He said you're
2 supposed to watch and sit there and stay there.
3 He was very pushy. I was doing my job very well.
4   Q. What was he doing?
5   A. He was walking around.
6   Q. Okay. Who was the supervisor that was
7 directing you on that date at Celadon?
8   A. I didn't see any supervisor there that
9 day. There was no supervisor there that day.
10   Q. There was no supervisor?
11   A. I never saw any -- a supervisor that --
12 I don't know. I don't know. I don't remember. I
13 know there was people without security clothes,
14 but I don't know if they're the supervisor or
15 not because I didn't know all Celadon Security
16 supervisors.
17   Q. But isn't it fair to say that at this
18 time when you first met or you say you first met
19 Abedekader Kouidri, that Rodney Butler was your
20 supervisor?
21   A. Yeah. He's the one that told me about
22 One Kendall Square.
23   Q. And what kind of clothing were you
24 wearing when you were at One Kendall Square the

### Page 77

1 date that you met Abedekader Kouidri the first
2 time?
3   A. I was wearing security clothes.
4   Q. And what was he wearing?
5   A. He was wearing street clothes.
6   Q. He was wearing street clothes?
7   A. Yes. He was never in security clothes.
8   Q. Any time you ever saw him --
9   A. No.
10   Q. -- he was never in security clothes?
11   A. The two times that I saw him, he was
12 never in security clothes.
13   Q. Well, what kind of clothing was he
14 wearing?
15   A. He was wearing jeans and a top.
16   Q. Jeans and a top?
17   A. Yes, or jeans and a -- he wasn't
18 wearing security clothes. He was swearing street
19 clothes.
20   Q. Was he wearing a suit?
21   A. No.
22   Q. Okay. No suit?
23   A. No suit, no.
24   Q. And he was wearing jeans and a top.

### Page 78

1 So, if he was wearing jeans and a top --
2   A. I don't know if it was jeans, but it
3 was street clothes. It was not security clothes.
4   Q. So how did you even know that he worked
5 for Celadon?
6   A. No. The security there told me -- told
7 him to show me around the building and he used to
8 come in and he signed in the book. He came in
9 twice and he signed in the book and he had a
10 radio.
11   Q. He had a what?
12   A. A radio.
13   Q. A radio?
14   A. A walkie --
15   Q. Didn't you have a walkie-talkie, too?
16   A. No.
17   Q. You did not?
18   A. No, no. The other ones did but not me.
19   Q. How come you didn't?
20   A. I don't know. I don't know.
21   Q. Now, who told him -- strike that.
22     Directing your attention to the day
23 that you believe you first met Abedekader Kouidri,
24 correct, focusing your attention on that, who told

Page 79

1 you as you just told us that he should show you
2 around the building?
3 A. It was an older security guard.
4 Q. Was he a supervisor, the older security
5 guard, or just another --
6 A. I don't know. He had security clothes
7 on, but I don't know was he a supervisor or not,
8 but he had security clothes on. He had a blue
9 shirt and a tie and he had a, I think, I think
10 black pants or something.
11 Q. Okay.
12 A. He did have security clothes because it
13 said Celadon on the --
14 Q. But he didn't have a suit on, this
15 other gentleman?
16 A. No. He had security clothes.
17 Q. Security guard outfit?
18 A. A security outfit, the older guy that
19 told him to show me around the building.
20 Q. This was the first time you met him
21 when -- the first time he did not sexually harass
22 you, correct?
23 A. That day?
24 Q. Yes.

Page 80

1 A. That's the day he did sexually harass
2 me, when he showed me around the building.
3 Q. Okay. I'm talking about when you first
4 met Abedekader Kouidri.
5 A. I'm sorry.
6 Q. What happened on that day? Tell me
7 from the first time you met him what happened.
8 A. He was very pushy with me. He was
9 ordering me around. He was telling me what to do
10 and I thought I was doing my job very well. He
11 scared me because he was a very pushy and he was
12 ordering me around and he was not wearing security
13 clothes. He was wearing street clothes and he had
14 a walkie-talkie and I was working at the desk.
15 I got up to get a Pepsi or something.
16 I got up to do something and he told me to go back
17 and sit back at the desk because I should be there
18 all the time. I should not get up.
19 Q. And what was he doing, you said, during
20 this time?
21 A. He was just walking around.
22 Q. And when he was walking around, what
23 was he doing?
24 A. He was just walking around with the

Page 81

1 radio.
2 Q. When you say "walking around," walking
3 around the whole facility?
4 A. He was walking around the construction
5 place. He walked -- he passed by me and he told
6 me that and then I don't know where he went after
7 that.
8 Q. How many hours was he there for that
9 day; do you recall?
10 A. I don't know.
11 Q. And how many hours were you there for?
12 A. The 5th, the 5th?
13 Q. No, no, not the 5th. This is the first
14 time you met.
15 A. I don't remember how long I was there
16 that day.
17 Q. And were there any other security
18 guards there when the two of you were there?
19 A. I don't remember.
20 Q. You don't remember?
21 A. Oh, no. Was anybody else working there
22 at that time?
23 Q. Yes.
24 A. Yes.

Page 82

1 Q. Who else was there?
2 A. They were up front.
3 Q. And who were they?
4 A. I don't remember. I don't remember
5 exactly their name.
6 Q. Now, when he started being pushy
7 towards you, did you think about going up front to
8 talk to these other people?
9 A. But I thought he was the supervisor.
10 Q. Why did you think he was the
11 supervisor?
12 A. Because he didn't have security clothes
13 on and he had a walkie-talkie and he was very
14 pushy with me. He was the only one that was like
15 that to me, so I thought he was the supervisor.
16 Q. So you thought he was the supervisor --
17 this is the first time, not the time he allegedly
18 sexually harassed you. The first time you met
19 him, you thought he was the supervisor, correct?
20 Is that what you're telling us?
21 A. Yeah, because he was very pushy with
22 me. He was ordering me around. He didn't have
23 security clothes on. He had street clothes on.
24 Q. He had street clothes?

Page 83

1 A. Yes.
2 Q. But, in fact, don't you recall telling
3 us that the supervisors always had suits on?
4 A. They had street clothes on, yes.
5 Q. No, suits?
6 A. Suits, yes.
7 Q. Suits are different than street
8 clothes, correct?
9 A. Well, I said he had street clothes on.
10 I don't remember what kind of street clothes he
11 had on.
12 Q. Didn't you just tell us that he didn't
13 have a suit on? I specifically asked you --
14 A. Who? No.
15 Q. Abedekader Kouidri did not --
16 A. No. He didn't have security clothes
17 on.
18 Q. But he didn't have a suit on either,
19 did he?
20 A. He had street clothes on.
21 Q. Ma'am, ma'am, did he or did he not have
22 a suit on the first time you met him?
23 A. I don't think he did.
24 Q. Okay.

Page 84

1 A. I don't recall. I don't think he did
2 have a suit on, yes.
3 Q. In fact, you said that he had some kind
4 of -- I think your words were jeans and a top on,
5 correct?
6 A. He had -- I think so. I didn't really
7 look at him.
8 Q. Okay. So you thought that a
9 supervisor -- strike that.
10 Now, do you recall previously telling
11 us that the supervisors, Mark Gangone and Rodney
12 Butler, always had suits on, correct?
13 A. Rodney had suits on.
14 Q. And didn't Mark, too?
15 A. I don't remember.
16 Q. You don't remember?
17 A. No.
18 Q. And don't you recall also telling us
19 that you knew they were supervisors because they
20 had suits on, correct?
21 A. I knew Mark was a supervisor because he
22 hired me and I think he did have a suit on, yes,
23 yes.
24 Q. Okay. Also didn't they tell you that

Page 85

1  they were your supervisors?
2    A. Mark, yeah, Mark said he was the
3  supervisor.
4    Q. Didn't Rodney tell you he was your
5  supervisor, too?
6    A. I think he did, yes.
7    Q. Did Abedekader Kouidri ever tell you he
8  was your supervisor?
9    A. No.
10   Q. Did you ever ask him if he was your
11 supervisor?
12   A. No, because he -- no.
13   Q. No, no. Did you ever ask him if he was
14 your supervisor?
15   A. No.
16   Q. Okay. So you never asked him if he was
17 your supervisor, correct? He never told you --
18   A. I don't remember asking him, no.
19   Q. And he never told you he was your
20 supervisor, correct?
21   A. No.
22   Q. Okay. And he did not wear a suit,
23 correct?
24   A. No.

Page 86

1    Q. Okay. But you thought he was a
2  supervisor because he was wearing street clothes,
3  correct?
4    A. He was wearing street clothes, yes.
5    Q. And that's why you -- you're testifying
6  today that he -- I asked you point blank why did
7  you believe he was a supervisor, correct, and you
8  told me -- and I think we can actually read it
9  back -- he was very pushy and he was ordering me
10 around and he was wearing street clothes.
11       Did I --
12   A. The reason because -- the reason I said
13 I thought he was -- he was a supervisor, because
14 he wasn't wearing security clothes, because
15 everybody else that worked there was wearing
16 security clothes.
17   Q. But you had never seen a supervisor
18 wear the kind of outfit that he was wearing,
19 correct?
20   A. I really don't remember. He was
21 wearing street clothes.
22   Q. Right. But he was not wearing a suit?
23   A. I don't think he was.
24   Q. And you said he was very pushy. What

Page 87

1  do you mean by very pushy?
2    A. He was ordering me around, telling me
3  to do this, do that.
4    Q. What did he tell you to do?
5    A. He was telling me to sit -- to stay
6  sitting where I was and not to get up and get a
7  Pepsi or whatever.
8    Q. And how many times did he tell you to
9  sit?
10   A. About once or twice.
11   Q. And what else did he do?
12   A. He was --
13   Q. Other than once or twice, as you say,
14 telling you not to get up, what else did he tell
15 you?
16   A. He was telling me -- he was ordering me
17 around.
18   Q. Well --
19   A. He was telling me where to work.
20   Q. What do you mean where to work? What
21 did he tell you?
22   A. He wanted to send me over somewhere
23 else to work, but I didn't want to work there
24 because security put me over there, and he was

Page 88

1  asking me to go over to the other corner and work
2  there. But I said I'm going to stay here because
3  this is where -- this is where --
4    Q. Where your supervisor put you, right?
5    A. Not the supervisor, the person did.
6    Q. Who put you --
7    A. The person that worked there that day
8  that had the -- the person that worked there that
9  day.
10   Q. Yes.
11   A. He was a Vietnamese guy.
12   Q. Who was he?
13   A. He had street clothes -- he had
14 security clothes on, but I think he worked there.
15   Q. And he told you where to go?
16   A. Yeah, because he was -- yeah, yeah.
17   Q. Was he your supervisor?
18   A. No.
19   Q. But he told you where to go?
20   A. I don't think he was the supervisor.
21   Q. Okay.
22   A. He had security clothes on.
23   Q. So you don't think he was a supervisor,
24 but he told you where to go, correct?

Page 89

1    A. He told me to sit where I was sitting,
2  yes.
3    Q. And then this individual, Abedekader
4  Kouidri, told you to move, correct?
5    A. Yes.
6    Q. And you didn't move, correct?
7    A. No.
8    Q. You stayed where you were, correct?
9    A. Yeah.
10   Q. And what did he say then when you said
11 no, I'm not moving?
12   A. He didn't say anything.
13   Q. Now, if a supervisor told you to move,
14 would you have moved?
15   A. I don't know who -- I -- I don't know
16 who the -- who the -- I thought he was the
17 supervisor because he didn't have security clothes
18 on.
19   Q. But, other than that, was there
20 anything else --
21   A. There was no supervisor working there.
22 There was -- I -- I don't know. I don't know.
23   Q. Did you think to call Celadon to find
24 out -- strike that.

Page 90

1       You said this gentleman was pushy,
2  Abedekader Kouidri, correct?
3    A. Yes, he was.
4    Q. But did you think about picking up a
5  telephone to call Celadon, the headquarters, to
6  tell them that he was being pushy?
7    A. No, because he -- I didn't think of
8  doing that, no.
9    Q. And you could have picked up a
10 telephone and called them, correct?
11   A. The telephone was very far away from me
12 and I had to stay -- I -- I didn't want to go too
13 far away where I was sitting.
14   Q. Why?
15   A. Because I just went to get a Coke down
16 the hall, but the phone was very far away from me.
17   Q. If, in fact, this gentleman was
18 bothering you, as you suggest, couldn't you have
19 gone to the telephone to call the office to ask
20 them who this person was and why he was being so
21 pushy?
22   A. I didn't think of that.
23   Q. And there were other security guards at
24 One Kendall, correct, at this time?

Page 103

 1  Q. And what time did you begin your shift
 2  on May 5th, Saturday, May 5th?
 3  A. In the morning.
 4  Q. At 8:00?
 5  A. I guess so, yes.
 6  Q. Okay.
 7  A. I'm not sure. Yes. I guess it was at
 8  8:00, but I know I was there in the morning. I
 9  worked in the morning there.
10  Q. Who was on-site when you first came to
11  the One Kendall Square site in terms of other
12  security -- other Celadon Security personnel?
13  A. There was guys at the front desk.
14  Q. Guys at the front desk?
15  A. Yes.
16  Q. And who was there?
17  A. I don't know. I really don't know
18  their name.
19  Q. You don't know their name?
20  A. In the morning --
21  Q. Yes.
22  A. -- there was a Chinese guy working
23  there and there was a few other people working
24  there.

Page 104

 1  Q. The same Chinese guy who previously had
 2  told you where to go?
 3  A. He put me sitting at the chair at the
 4  desk, yes.
 5  Q. And this is on May 5th he did the same
 6  thing again?
 7  A. No.
 8  Q. No.
 9  A. He told me where to go -- I don't know,
10  but I know he was there that day.
11  Q. Now, who told you to go and provide
12  security guard services to One Kendall Square on
13  May 5th?
14  A. On May 5th?
15  Q. Yes.
16  A. Who was the supervisor who told me to
17  do that?
18  Q. Yes.
19  A. I think it was Rodney.
20  Q. Was it Rodney?
21  A. He's the one that gave me the job
22  there, yes.
23  Q. So it would be fair to say that Rodney
24  Butler was your supervisor on May 5th and told you

Page 105

 1  to go to the site?
 2  A. Yes.
 3  Q. Okay.
 4  A. I believe he was, yes.
 5  Q. Okay.
 6  A. Because he's the one that told me --
 7  that gave me those jobs.
 8  Q. So you walked into the site on
 9  Saturday, May 5th, and you saw the Chinese guy and
10  what did you do then?
11  A. Yeah. There was people at the desk.
12  There was guys at the desk, at the front desk.
13  Q. How many guys?
14  A. About maybe two or three.
15  Q. And you have no -- do you recall what
16  they looked like?
17  A. All I remember is -- is the Chinese guy
18  that was there. I don't know his name.
19  Q. And you never asked him his name?
20  A. I did, but -- I don't remember. He
21  told me his name. I didn't ask. He told me.
22  Q. So you went to the site and saw the
23  Chinese guy and then what happened. What did the
24  Chinese guy say to you?

Page 106

 1  A. Somebody told me that I'd be working
 2  in the back in the construction and to -- so that
 3  somebody over there that was going to leave and
 4  he -- somebody sent me over to the construction
 5  place and I sat down there and -- at the desk.
 6  Q. Who sent you over there?
 7  A. I don't remember, one of the security.
 8  Q. And so then you -- do you recall the
 9  distance between the front desk, as you say, and
10  the security site -- excuse me, the construction
11  site?
12  A. Do I know --
13  Q. How far?
14  A. You go one building and it's the next
15  building over.
16  Q. And so you went into the next building,
17  correct?
18  A. Yes, yes.
19  Q. And who was there?
20  A. There was somebody there. When I got
21  there, he left.
22  Q. Did you talk to him?
23  A. No, no.
24  Q. You did not?

Page 107

 1  A. No. I didn't get a chance to talk to
 2  him because when I got there he was on his way
 3  out.
 4  Q. And what did you do then -- strike
 5  that.
 6      He was on his way out and you got
 7  there. What happened next?
 8  A. I just sat down there.
 9  Q. You sat down?
10  A. Yes, I sat down.
11  Q. At a desk?
12  A. There was a desk in front of me with a
13  chair.
14  Q. And what was on top of this desk?
15  A. There was a book that people sign in
16  and out.
17  Q. Was there a phone on the desk?
18  A. No.
19  Q. There was no phone?
20  A. No. There was never no phones back
21  there. There was a pay phone way far away from
22  the desk, but it's way down the hall.
23  Q. Were you the only security guard from
24  Celadon in the construction site at that time when

Page 108

 1  you first got there?
 2  A. There was somebody else further up from
 3  me.
 4  Q. And what was he doing?
 5  A. He was sitting there, too.
 6  Q. At a desk?
 7  A. At the desk, yes.
 8  Q. And who was that?
 9  A. He was -- he was -- he was disabled.
10  He had crutches.
11  Q. Do you know what his name was?
12  A. No, no.
13  Q. I'm going to ask you if you would,
14  please, to draw me a diagram --
15  A. I don't know how to draw. I don't know
16  how to draw anything.
17  Q. You don't know how to draw anything?
18  A. No, no.
19  Q. Okay.
20  A. I'm sorry. I don't know how to draw.
21  Q. Well, I just want --
22  A. I don't know how to draw.
23      MR. KUTCHIN: Why don't we take a
24  two-minute break and we'll draw a diagram.

Page 127

1 Q. Okay. So now getting back to May 5th,
2 Saturday, May 5th, your first shift at One Kendall
3 ends about approximately at 4:00, correct, and you
4 were doing a double shift, correct?
5     A. Yes.
6     Q. And what did you do then? At the end
7 of your first shift what did you do?
8     A. End of my first shift, I stayed there
9 and worked a double.
10    Q. Okay. But did you get up and leave
11 your post?
12    A. Yes, I did. I went over to the front.
13    Q. And why?
14    A. To ask the security over there does he
15 want me to stay over there or does he want me to
16 go sit somewhere else.
17    Q. And was it the same Vietnamese
18 gentleman?
19    A. No. It was an older guy.
20    Q. And why did you ask him if he wanted --
21 strike that -- if he wanted you to go someplace
22 else?
23    A. Because the person that put me there,
24 he said I won't -- that was -- that he was working

Page 128

1 there until 4:00 and then the guy came up to me --
2 I don't know which one it was -- and he asked me
3 to work overtime.
4     Q. Who asked you to work overtime?
5     A. I don't remember. I think it was
6 the -- I don't remember, a security guard.
7 Somebody called from Celadon over there and they
8 asked the people there would anybody work overtime
9 and he asked me and that's when I worked overtime
10 that night.
11    Q. And the person that asked you, was he
12 the person who had been sitting at the front desk?
13    A. Yeah. He'd been there all day, yes.
14    Q. So he was the person. He was, as you
15 call him, the security at the front desk that
16 asked you if you would work overtime?
17    A. Yes, I believe so, yes.
18    Q. And you said yes?
19    A. Yes.
20    Q. So then you at the end of your first
21 shift --
22    A. Yes.
23    Q. -- on the construction site, you walked
24 to the front desk, correct?

Page 129

1     A. Yes.
2     Q. Who did you see at the front desk when
3 you walked --
4     A. It was an older guy with gray hair.
5     Q. Do you know his name?
6     A. No, I don't.
7     Q. You have no idea?
8     A. No, I don't know.
9     Q. He wasn't a supervisor, correct?
10    A. He had security clothes on.
11    Q. So what does that mean, if he had
12 security clothes on?
13    A. I don't know. I have no idea. I
14 didn't ask. I didn't ask him whether he was a
15 supervisor or not.
16         MR. MULHEARN: You've been around and
17 around on that particular issue. I think she's
18 answered your question. She doesn't know if he
19 was a supervisor or not a supervisor.
20         MR. KUTCHIN: She keeps saying he was
21 in security guard clothing.
22    Q. What does that mean, he was in security
23 guard clothing?
24    A. A lot of people that worked at Celadon

Page 130

1 was not security clothes, even in Watertown.
2 There was security working there. They were not
3 in security clothes and they thought that somebody
4 would walk off the street there and they called
5 the police.
6     Q. So you saw the older guy and what did
7 the older guy tell you?
8     A. The older guy told me -- I don't
9 remember what he tell me, but I know this guy came
10 in after four.
11    Q. Which guy came in after four?
12    A. The foreign guy.
13    Q. How do you know he came in after four?
14    A. I was sitting right there when he came
15 in.
16    Q. You were at the front desk?
17    A. Yes.
18    Q. How long did you stay at the front desk
19 for?
20    A. A couple minutes.
21    Q. Okay.
22    A. Just a couple minutes until I signed
23 the book again. They told me I have to sign the
24 book to let them know I worked a double shift.

Page 131

1     Q. So you signed the book, correct?
2     A. Yes, yes.
3     Q. And then the foreign guy came in?
4     A. I don't remember. He came in, yes,
5 yes.
6     Q. Did he say anything to the older guy?
7     A. I didn't see him saying anything, no.
8     Q. Did the older guy say anything to him?
9     A. Maybe he did. I wasn't looking.
10    Q. So you don't know?
11    A. He just came in off the street.
12    Q. Then what did he do when he came in off
13 the street?
14    A. He went in and -- I don't know. He
15 went in and -- in a room or something. I don't
16 know. I just saw him coming in and that's all I
17 know.
18    Q. So you saw him coming in, correct?
19    A. Yes. There was a lot of people coming
20 in.
21    Q. Okay. But I'm talking about --
22 describe for me what this foreign person looked
23 like that you saw come in.
24    A. He was a -- the one that sexually

Page 132

1 harassed me?
2     Q. Well, whoever you're saying came in,
3 the foreign person?
4     A. He was a short guy. He had glasses and
5 I believe he had dark hair.
6     Q. Short guy. Was he heavy-set, thin?
7     A. No. I don't believe he was heavy, no,
8 no.
9     Q. Okay. So where were you standing or
10 sitting when this foreign person came in?
11    A. I believe I was sitting behind the desk
12 and the -- and the other security was standing
13 right over there.
14    Q. Okay.
15    A. I was signing in the book.
16    Q. And then what happened?
17    A. Then I don't know what time, but the
18 security -- the older security asked this guy here
19 to show me around the building, to show me what to
20 do in case I'd be working alone, so I'd know what
21 to do when I'm working alone.
22    Q. Now, in the 15 times that you had
23 previously worked at One Kendall Square had the
24 security at the front desk ever asked anybody to

Page 133

```
 1  show you around the building?
 2     A. No.
 3     Q. Okay.
 4     A. No.
 5     Q. So why all of a sudden were they now
 6  asking --
 7     A. I have no idea.
 8     Q. Did you ask him?
 9     A. No, I didn't. No, I didn't.
10     Q. Why didn't you ask him?
11     A. Ask him what?
12     Q. Why you needed to go around the
13  building?
14     A. No. I thought it was part of the job.
15  I was just -- I thought it was part of my work.
16     Q. So it's your testimony as you sit
17  here --
18     A. I'm not going to ask -- I thought that
19  was part of my job. I worked security.
20     Q. But had you ever done that at One
21  Kendall Square before?
22     A. I do not remember. I don't remember
23  anybody showing me around the building, no, no.
24     Q. Okay.
```

Page 134

```
 1     A. I don't remember that. I just don't
 2  remember.
 3     Q. So what happened? So the individual
 4  who was the -- strike that.
 5        The older, gray-haired man asked the
 6  foreign person to show you around?
 7     A. Show me around the building in case I'd
 8  be working alone and I wouldn't know what to do.
 9     Q. And had you ever worked alone in any
10  of the 15 times you'd previously worked at One
11  Kendall Square?
12     A. I was sitting at the desk. There was
13  another guy right across from me.
14     Q. So would it be fair to say you had
15  never worked alone when you were at One Kendall
16  Square?
17     A. I never worked -- I was -- I was
18  sitting at the desk and there was a guy right
19  over. I don't know was that alone or --
20     Q. Was that --
21     A. I don't know what's --
22     Q. When the older gentleman said to the
23  foreign person that he should show you around in
24  case you were working alone, did you ask the other
```

Page 135

```
 1  person what he meant by that?
 2     A. No.
 3     Q. You did not?
 4     A. I don't believe so. I don't know.
 5  That's the year 2001. That was very -- I don't
 6  know.
 7     Q. In fact, isn't it true that -- weren't
 8  there always a lot of security people around as
 9  you previously testified to when you worked at One
10  Kendall?
11     A. I didn't say there wasn't.
12     Q. That's what I'm asking. Weren't
13  there --
14     A. When I first came, but in the morning
15  there was security there.
16     Q. How about in the afternoon?
17     A. There was me and this older guy and
18  there was another guy that was coming in and at
19  night there was less working at night than was in
20  the morning.
21     Q. How many less?
22     A. I see more in the morning at the desk,
23  but then when I go there again, they're not there
24  no more. So I don't know if they were leaving to
```

Page 136

```
 1  go home or they were just coming in. I don't
 2  know.
 3     Q. When you worked after 4:00, was there
 4  always another security guard in the construction
 5  area where you were working, sitting at a desk?
 6     A. I believe there was, yes, yes.
 7     Q. Okay.
 8     A. I believe there was.
 9     Q. Now, when the older gentleman asked
10  the foreign person to show you around, did he
11  introduce you to him?
12     A. I do not remember that. I do not
13  remember, but I -- I do not remember.
14     Q. You do not --
15     A. No, I don't.
16     Q. What did he say to you specifically?
17     A. He said -- he said to me, he said, this
18  gentleman will show you around the building in
19  case you work alone and you will know what to do.
20     Q. What did the -- okay. So he never said
21  to you this gentleman's name is?
22     A. I don't -- I don't remember. I don't
23  remember, but I don't -- I don't recall.
24     Q. And do you know if this gentleman who
```

Page 137

```
 1  was a foreign person worked for Celadon?
 2     A. Yeah, he did.
 3     Q. How did you know?
 4     A. Because he signed in the book when he
 5  came in.
 6     Q. He signed in the book?
 7     A. Yes.
 8     Q. Do you know what he signed in?
 9     A. No. I didn't look after he signed in
10  the book.
11     Q. Okay.
12     A. But he -- security was talking to him,
13  so he had a radio. He had a radio that security
14  has.
15     Q. Did he have a hat?
16     A. Did he have a hat? I -- I don't know
17  if he had a hat or not, but I think -- I think he
18  did or I'm not sure though. I'm not sure.
19     Q. You don't know?
20     A. I don't know if he had a hat or not,
21  no.
22     Q. Describe what clothing he was wearing.
23     A. He was wearing street clothes.
24     Q. What do you mean by street clothes?
```

Page 138

```
 1     A. Street clothes, like, I don't know,
 2  sweater and a pants.
 3     Q. You keep telling us you have a vivid
 4  recollection of that day and I'm asking you
 5  specifics. I want to know what you recall he was
 6  wearing.
 7        MR. MULHEARN: You're entitled to a
 8  best memory and she says she remembers the day,
 9  but she didn't say she had a vivid recollection of
10  everything, including what the weather was like
11  out there, if you want to ask that.
12     Q. Do you remember, did he have on jeans?
13     A. He had on pants and a top.
14     Q. Okay. Was it a suit he was wearing
15  that day?
16     A. I do not believe so.
17     Q. Okay.
18     A. But he wasn't in security clothes.
19     Q. So he wasn't in security clothes. So
20  why did you then go with him if he wasn't in
21  security clothes?
22     A. Because the security asked him would he
23  show me around, this other security asked him to
24  show me around the building, to show me what to do
```

Page 181

me if I'm reading this correctly, ma'am, "In and around early May, '01." Did I read that correctly?
A. Yes.
Q. "I was working overtime at One Kendall place in Cambridge from four to 12 p.m."?
A. Yes.
Q. Okay. Now, as we've identified, you weren't at One Kendall Square on May 1, were you?
A. I have no idea, the beginning of May. I don't know what date. I don't remember.
Q. Okay.
A. I don't remember.
Q. If you can just please with me look at Exhibit 6 --
A. I didn't write this.
Q. Ma'am, ma'am, please. You signed that saying it was true, didn't you?
A. But I didn't tell him it was May 1st. I told him the beginning of May. I didn't tell him it was the first. I told him the beginning.
    MR. MULHEARN: It doesn't say the 1st.
    MR. KUTCHIN: It does say the 1st.

Page 182

It says May 1.
    MR. MULHEARN: No, in early May, '01.
    MR. KUTCHIN: Yes, '01.
    MR. MULHEARN: This could be --
    THE WITNESS: It could be any time.
    MR. MULHEARN: I'm talking now.
    THE WITNESS: Okay. Sorry, Richard.
    MR. MULHEARN: I need you to put a --
    THE WITNESS: Okay.
    MR. MULHEARN: I interpreted that to be a month and a year.
    MR. KUTCHIN: Okay.
    MR. MULHEARN: Maybe it's not.
Q. It says you were working at One Kendall Place, correct?
A. Yes.
Q. Okay. From 4:00 p.m. to 12:00 a.m., correct? Did I read that correctly?
A. Yes, yes.
Q. And it says, "While working at this site, I was harassed by a foreign employee of Celadon," correct?
A. Yes.

Page 183

Q. Now, you don't mention his name there, correct?
A. No.
Q. Now, subsequently, Exhibit 8 mentions the name as we already --
    MR. MULHEARN: Meaning afterwards.
Q. Yes, afterwards. I'm sorry. Paragraph 15, all of a sudden now you identify this individual as Mr. Kouidri, correct?
A. I don't know his name. I never knew his name.
Q. Okay.
A. I didn't know --
Q. Let me finish, please. How did you determine to put that in the complaint, ma'am?
A. I did not put his name down. I told them it was a foreign guy. I don't know. I -- somebody put his name down.
Q. Who put his name down?
A. I don't know. It wasn't me because I didn't know his name.
Q. So, as you sit here today -- excuse me.
A. Yes.

Page 184

Q. As you sit here today, do you know definitely whether the man whose name is supposedly Abedekader Kouidri is the one who supposedly sexually harassed you --
A. Yes.
Q. -- at One Kendall Square?
A. Because I told -- somebody asked me what he looked like and I told him what he looked like and I told him that he was not in security clothes and I told him he was a foreigner and I told him what he looked like, and that's how they know his name, but I didn't know his name.
Q. Who's they?
A. The security, I guess, security, but I didn't know his name.
Q. So how do you know if the person in the complaint is correctly named?
A. The way I told the security, they asked me what he looked like and I told them what he looked like.
Q. But isn't it true, ma'am, that Celadon Security has many foreign people that work for them?
A. I don't know.

Page 185

Q. You don't know?
A. There was a Chinese guy. He was -- I don't know. He was born in America.
Q. Who was?
A. I don't know. Was he a foreigner or I don't know what -- he spoke good English anyway. I don't know if he was a foreigner or not.
Q. Who are we talking about now?
A. The Vietnamese guy, Chinese guy.
Q. Forget about that gentleman. The gentleman you referred to as a foreigner, did he have darker skin?
A. Yes.
Q. Were there other people who worked for Celadon who had darker skin other than this individual who you said molested you or sexually harassed you?
A. They didn't have darker skin.
Q. There was nobody else in the employ of Celadon who had darker skin?
A. They were black, but they weren't dark like -- like --
Q. And again looking at this, ma'am, Exhibit 10, it says, "I thought he was the

Page 186

supervisor because he was always giving me orders."
    When did he always give you orders?
A. That's what I said. He was pushing me around, telling me what to do.
Q. And as you said the only time he did that was you had seen him one other time, correct?
A. Yes, I think so.
Q. So you're basing his always giving you orders on this one other time that you supposedly were with him, correct?
A. Yes. I believe I saw him once before that, yes.
Q. And so your making the statements he was always giving me orders relates to this one time you previously saw him, correct?
A. Yes.
Q. On May 5th did he give you any orders?
A. I don't believe so, no.
Q. Now, when did you first report this incident to anybody at Celadon?
A. It was the 5th -- I believe it was the 7th.
Q. Okay. How did you go about doing that?

### Page 211

1  Dean. I think she'll allow me to. We're at a key
2  point, Richard. Again, we've wasted a lot of time
3  on questions that keep getting reanswered. So
4  it's up to you. I'll suspend and we can go see
5  her right now or we can continue. I'm almost
6  done. It's up to you.
7      MR. MULHEARN: Around ten more
8  questions or so.
9      Q. Again, as you can see, I'm at the heart
10 of this and I think I have every right to ask her
11 about this.
12     A. Let's finish it.
13     Q. Ma'am, if you can see here, it says
14 complaints of sexual harassment. Can you read
15 that?
16     A. No, no.
17     Q. Okay. See it says Roman Numeral 3,
18 complaint of sexual harassment? Did I read that
19 correctly?
20     A. Is this it here?
21     Q. Yes.
22     A. Okay.
23     Q. If you would follow along as I read
24 it, "If any of our employees believes that he or

### Page 212

1  she has been subject to sexual harassment, the
2  employer has the right to file a complaint with
3  our organization. This may be done in writing or
4  orally."
5      Did I read that correctly?
6      A. Yes.
7      Q. So you understand that if somebody does
8  something against you sexually, as you alleged,
9  that you could have as it states here filed a
10 complaint with Celadon, correct?
11     A. I don't remember reading this when I --
12 my counselor filled this out. I believe she
13 filled this out and I signed it. This is not the
14 application, okay? I don't remember seeing this.
15 I don't remember reading that because I do not
16 remember reading this, but I guess I did. But I
17 don't remember.
18     Q. Well, in fact, as you recall, these
19 were the employment terms and conditions -- this
20 is Exhibit 4 she's reading from -- -- which relate
21 to your employment by Celadon.
22     So isn't it fair to say that you were
23 the one who chose not to file a complaint or
24 pursue it?

### Page 213

1      A. No, no.
2      Q. No?
3      A. Nobody asked me about it ever again
4  when I reported it. Nobody mentioned it again to
5  me. So I --
6      Q. But did you ever ask them about it?
7      A. No.
8      Q. Okay.
9      A. Because I called them and I told them
10 about it, but they never said a word ever after
11 that about it so...
12     Q. I thought you just told me that Rodney
13 Butler said something about it?
14     A. That was the road supervisor.
15     Q. No, no. Rodney Butler, you just said,
16 told you not to say anything to anybody at Marina
17 Bay about what had happened?
18     A. He said that, but that's the only thing
19 he said about it. That's the only thing that he
20 said. He didn't say anything else about it.
21 That's the only thing.
22     Q. But, as you said, you could have but
23 you chose not to say anything to Rodney Butler
24 when he brought up the topic when he was bringing

### Page 214

1  you to Marina Bay, correct?
2      A. I don't remember. I don't know what
3  you're saying.
4      MR. KUTCHIN: Could you repeat the
5  question, please?
6      (The question was read by the
7  Reporter.)
8      A. No. He didn't bring up the topic when
9  he was bringing me there. He said it over in the
10 Marina Bay.
11     Q. Well, when he said it to you over in
12 Marina Bay, couldn't you have said to him, Rodney,
13 what is happening with what I told you about the
14 sexual harassment at One Kendall Square?
15     A. I couldn't talk to him because there
16 were too many people around.
17     Q. Well, couldn't you have said to him I
18 want to talk to you privately?
19     A. No, because I didn't see any private
20 place I could talk to him.
21     Q. Okay.
22     A. I was new there. I was just -- I just
23 got there that night. I didn't know.
24     Q. Ma'am, so, anyway, you went on your --

### Page 215

1  on May 11th you went to Marina Bay, correct?
2      A. Yes.
3      Q. And what happened that night at Marina
4  Bay?
5      A. I finished my shift at 12:00. That was
6  my shift, from five until midnight. I waited
7  until about almost 1:00, quarter of one, I
8  believe, and nobody picked me up. I didn't have a
9  phone to call anybody.
10     I called my supervisor that day,
11 Rodney, and I told him I didn't have a phone and
12 he said a phone would be there that night when I
13 go there and there was no phone there and I was
14 left stranded there all night.
15     Q. All night.
16     A. Yes. If I had stayed there, I would be
17 there all night, but I choose to walk home.
18     Q. Now, ma'am, isn't it true that the
19 shifts that you worked at Marina Bay were from
20 5:00 p.m. to 1:00 a.m.?
21     A. That's not true.
22     Q. That's not true?
23     A. My shift was -- Rodney told me my shift
24 was there from 5:00 until midnight because every

### Page 216

1  night the supervisor picked me up at 11:30.
2      Q. At 11:30?
3      A. Yes, yes.
4      Q. Didn't you normally work an eight-hour
5  shift?
6      A. Yes. But he said when he picked me up
7  I had to go with him. I didn't want to walk
8  home.
9      Q. Okay.
10     A. He said when he'd get there at 11:30,
11 he said, you have to go home, because he was there
12 to pick me up and I had to go.
13     Q. So it's your testimony as you sit here
14 today that on May 8th this supervisor picked you
15 up at 11:30?
16     A. May 8th?
17     Q. Yes.
18     A. Around that time. He picked me up
19 before -- it was before midnight so I had to go
20 with him.
21     Q. So you're saying on May 8th, May 9th
22 and May 10th the supervisor picked you up prior to
23 12 p.m.?
24     A. They picked me up before 12:00 p.m.,

**Page 223**

1  fired me or something; that I didn't hear anything
2  from them since May 11th and I figured I didn't
3  have a job anymore and that's why I returned my
4  clothes that Friday.
5    Q. But did anybody at Celadon tell you
6  that you didn't have a job?
7    A. No. But they didn't call me to talk
8  to me about that night, that night I was left
9  stranded in Marina Bay.
10   Q. They didn't call you to talk -- who
11 would have called you?
12   A. It's supposed to be my supervisor,
13 Rodney.
14   Q. And you're saying he didn't call you?
15   A. I don't remember, no. I don't remember
16 him calling me at all.
17   Q. Well, you don't remember or he didn't
18 call you? Which one is it?
19   A. I don't think he did.
20   Q. But you're not sure?
21   A. Because I don't remember talking to
22 him.
23   Q. Isn't it, in fact, true that he did
24 call you and you told him you wanted to resign?

**Page 224**

1    A. No, no. I didn't say that to him. I
2  just talked to him when I went over there with my
3  clothes and signed papers.
4    Q. You did, in fact, go to Celadon on
5  May 18th, correct?
6    A. I went there, but it could be May 18.
7  It was on a Friday.
8    Q. What happened when you went there?
9    A. I just walked in there and I -- I
10 talked to Rodney.
11   Q. What did you tell Rodney?
12   A. He asked me -- I didn't tell him
13 anything. He put papers in front of me and asked
14 me to sign them.
15   Q. But you didn't have any discussion with
16 Rodney?
17   A. He said something, but I -- I don't
18 remember what he said. He was talking about the
19 paper I was supposed to sign. He was telling me
20 what was in it. He was asking me questions about
21 the paper, would I -- would I sign my name to it.
22   Q. And what did you tell him?
23   A. He told me to sign it and I signed it.
24   Q. But, I mean, what did he tell you the

**Page 225**

1  paper said?
2    A. Whatever the paper said.
3    Q. No. What did he tell you? I'm asking
4  you as you sit here today what did Rodney Butler
5  tell you?
6    A. He showed me a paper and he read it and
7  he -- he told me it -- to sign it. He asked me
8  questions about it, so I have --
9    Q. Okay. What did he say it said?
10   A. It was a yes or no answer.
11   Q. But what did he tell you it said?
12   A. I don't remember what he told me it
13 said.
14   Q. You don't remember, okay. You said he
15 asked you some questions. What questions did he
16 ask you?
17   A. It had to do with the paper that he
18 showed me and then he handed me an unemployment
19 paper and he told me to file unemployment.
20   Q. And the piece of paper -- so isn't it
21 true you read the piece of paper that you signed?
22   A. No. He was reading it. I didn't read
23 it.
24   Q. But don't you -- you don't normally

**Page 226**

1  sign a piece of paper unless you read it, do you?
2    A. He told me what it meant.
3    Q. Well, what did he tell you?
4    A. I don't know. That was -- I don't
5  remember.
6    Q. You don't remember?
7    A. No, I don't remember.
8    Q. Ma'am, I'm going to show you what has
9  been marked as Defendants' Exhibit No. 12.
10   A. That must be it, the 18th.
11   Q. Ma'am, if you could just look at this
12 for a few points, please. First of all, ma'am, if
13 you'll follow along with me, at the bottom here
14 where I'm pointing, is that your name?
15   A. Yes.
16   Q. And is that your signature?
17   A. Yes.
18   Q. And up here, is that your handwriting?
19   A. That's my handwriting, yes.
20   Q. And that's your handwriting where it
21 says date?
22   A. Yes. He told me to sign my name there.
23   Q. He told you. Do you just do things
24 without -- if somebody tells you to do something,

**Page 227**

1  don't you normally think about it?
2    A. He explained to me what it said at that
3  time.
4    Q. Okay.
5    A. And he asked me questions about it and
6  he told me to put my initials there.
7    Q. But did you agree with what he told
8  you?
9    A. I guess at the time I did, yes.
10   Q. You did, okay. So, in other words,
11 isn't it fair to say that you wouldn't have signed
12 something unless you agreed with it?
13   A. That was after September 11th. I was
14 through a lot at that time.
15   Q. Ma'am, please answer my question.
16      Isn't it true that you wouldn't have
17 signed something if you disagreed with what it
18 said?
19   A. No.
20   Q. No.
21   A. I don't -- if I disagree with it, I
22 wouldn't sign it?
23   Q. Correct.
24   A. No. I would sign it -- I agree with it

**Page 228**

1  and then I sign it.
2    Q. That's what I'm saying. So you signed
3  this document. Now, it says here, No. 1,
4  resignation, correct? Did I read that correctly?
5    A. Yeah, but I don't know what that means.
6    Q. Resign, didn't you resign, in other
7  words, you voluntarily -- you decided to leave the
8  employ of Celadon, correct?
9    A. I did return my clothes that day.
10   Q. And you decided to do that? They
11 didn't say to you you're fired, did they?
12   A. No. But they didn't call me either to
13 tell me anything.
14   Q. But they didn't tell you that you were
15 fired, did they?
16   A. No, they didn't.
17   Q. So it says resignation. Isn't that
18 your initials?
19   A. Yes.
20   Q. Isn't it true that Mr. Rodney Butler
21 explained to you what resignation meant and that
22 you chose to resign?
23   A. That was a week after that because I
24 wasn't hearing from Celadon, that they didn't call