UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARY NEWELL,          )<br>    Plaintiff,                  )<br>                                    )<br>v.                                 )<br>                                    )<br>CELADON SECURITY SERVICES, INC., )<br>RODNEY BUTLER, KEITH GREEN;   )<br>AND ABEDEKADER KOUIDRI,       )<br>    Defendants.              ) | DOCKET NO.  04-10429- JGD |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### I.     NATURE OF THE ACTION

In this action, Plaintiff claims that she was sexually harassed and discriminated against on the basis of sex by Defendant Celadon in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and its state counterpart, M.G.L. c. 151B. Plaintiff also claims that Defendant Celadon retaliated and discriminated against her in response to her complaints of sexual harassment in violation of those statutes.

### II.    PROCEDURAL STANCE

Plaintiff's complaint asserted counts against the individual Defendants Rodney Butler ("Butler") Keith Green ("Green") and Abedekader Kouidri ("Kouidri"). Kouidri was the alleged harasser. Butler and Green were supervisory employees involved in the alleged retaliatory acts. All three are former employees of Celadon. Butler and Green have defaulted. Kouidri, whose whereabouts are unknown, was never served.

### III.   STATEMENT OF FACTS

Plaintiff was employed by Celadon as a security guard from December 2000 to May 2001. Plaintiff had no previous experience as a security guard and she received no

training to speak of from Celadon. Plaintiff's immediate supervisor for most of her employment at Celadon was Defendant Rodney Butler. He gave Plaintiff her work assignments. However, he did not work at the sites with her.

On 5/5/01, Defendant Kouidri sexually assaulted Plaintiff at a work site. Kouidri was an employee of Celadon. The work site was One Kendall Square. Plaintiff worked a double shift that day. During the second shift, Plaintiff was asked by the older security guard on the site to accompany Kouidri on a tour of the building so that Plaintiff would know what to do in case Plaintiff had to work alone. During this tour, Kouidri brought Plaintiff to the basement in a poorly lit area. Kouidri grabbed her breast. Plaintiff pushed him away. He then pushed Plaintiff against the wall and kissed her.

I believed that Kouidri was a supervisor at Celadon. Kouidri wore street clothes instead of a security uniform like the security guards wore. Plaintiff had seen Kouidri once before at the same site. Kouidri wore street clothes then as well. Plaintiff's experience at Celadon was that supervisors did not wear security uniforms. Kouidri acted like a supervisor on the earlier occasion. At that time, when Plaintiff left her desk to get a soda, Kouidri yelled at her and ordered her to return to her desk. Kouidri told Plaintiff that she was supposed to sit there and stay there. He was very pushy. He also walked around with a walkie-talkie. Plaintiff was never given a walkie-talkie by Celadon.

Plaintiff reported the sexual assault to Celadon two days later on 5/7/01. Plaintiff reported it to a supervisor of Celadon named Frank Doran. Plaintiff believes that she also reported it to her immediate supervisor Rodney Butler. On the day after Plaintiff reported the sexual assault, she was transferred to a different site, Seaport Condominium at Marina Bay in Quincy ('Marina Bay"). This site was very difficult to get to by public

2

transportation during the day and there was no public transportation to get home at the end of the shift. It was known to Celadon that Plaintiff did not have a car and had to rely on public transportation.  Rodney Butler arranged for another supervisor, Defendant Keith Green, to pick Plaintiff up at the end of the shift at Marina Bay to take her home to Dorchester.

Rodney Butler told plaintiff that her hours at Marina Bay were 5:00 p.m. to midnight. Plaintiff would be working alone at the site.  Plaintiff worked at Marina Bay from Tuesday, 5/8/01 through Friday 5/11/05.  She made her way there each day by public transportation.  On each night from 5/8/01 to 5/10/01, Mr. Green picked her up, arriving at approximately 11:30 p.m.

There was a telephone that Plaintiff could use at Marina Bay.  However, the telephone was not working properly.  By Thursday, the telephone was not working at all. Plaintiff spoke with Rodney Butler during the day on Friday, 5/11/01, and told him that the phone was not working at Marina Bay.  Rodney Butler promised that he would have a phone there for her when she arrived to work that night.  Celadon has denied that it promised a cell phone to Plaintiff at Marina Bay.  Celadon stated that Marina Bay had a phone, so it did not provide a cell phone.  Despite this claim, Celadon's own phone log for 5/12/01 shows a telephone call from the property manager of Marina Bay apologizing for the fact that the phone was broken.

When Plaintiff arrived to work at Marina Bay on Friday, 5/11/01, there was no phone as promised by Rodney Butler. Plaintiff continued to work from 5:00 p.m. on.  Mr. Green did not arrive to pick her up at the usual time of 11:30 p.m.  She continued to wait for him until approximately 12:45 a.m., but he did not show. Plaintiff had no way to call

3

anyone. Plaintiff was stranded there and was very worried and upset. At approximately 12:45 a.m., Plaintiff started to walk home to Dorchester. Plaintiff's attempt to walk home alone at that late hour and in that unfamiliar area was very frightening to her. There were motorcycles going by and dangerous looking people. Plaintiff was afraid for her safety. Plaintiff eventually made her way to a nursing home in the area. Plaintiff had no money for cab fare. Plaintiff was able to call her friend from the nursing home. Plaintiff arranged with him to take a cab to his home and for him to pay for the cab.

      Celadon's transfer of Plaintiff to Marina Bay following her complaint was disadvantageous to her. The site where Plaintiff had worked, One Kendall Square (as well as other sites where Plaintiff had worked) was accessible by public transportation. There were other security guards working there. There was also the opportunity to work double shifts and make more money. At Marina Bay, it was very difficult to get there by public transportation and there was no public transportation to get home. Plaintiff had to rely on Celadon to pick her up and take her home. Plaintiff worked alone and had no operable phone. There were no double shifts available there for extra money.

      Plaintiff's pay at Celadon (except for training sessions) was $8.50 per hour. However, Celadon has admitted that Plaintiff's pay at the Marina Bay site was $6.50 per hour. Complaint, para. 23; Celadon's Answer, para. 23. There was no reason that Plaintiff could see why transferring her to another site following her complaint was necessary. Plaintiff received no explanation from Celadon regarding why that was necessary.

      Plaintiff was very traumatized by these experiences at Celadon. Plaintiff suffered a severe deterioration in her mental health condition and had to be hospitalized. A

4

psychiatric evaluation of Plaintiff dated 5/13/05 stated that these events caused a worsening in her medical condition and an inability to maintain regular employment for approximately one year. Exhibit B to Plaintiff's Statement of Material Facts.

Celadon admits that it did not provide any sexual harassment training to its employees during any timeframe relevant to this litigation.

Celadon claims that it attempted to investigate Plaintiff's sexual harassment complaint by trying to schedule an interview with her on the day of or the day following her complaint. Celadon claims that Rodney Butler contacted Plaintiff and arranged for a meeting the next day, but Plaintiff did not show up. Celadon claims that Rodney Butler called and paged Plaintiff at least three times to inquire why she did not appear, but Plaintiff never returned his calls. However, Plaintiff states that she was never contacted for an interview and was never told what happened as a result of her complaint. Plaintiff states that the only subsequent mention of the incident by Celadon was a statement by Rodney Butler telling her not to mention it to the people at Marina Bay.

Celadon claims that following Plaintiff's report of the sexual assault, it planned to discuss the incident with Kouidri. However, it claims, Kouidri was on vacation at the time, so it planned to discuss it with him upon his return from vacation. Celadon claims that instead of returning from vacation, Kouidri simply picked up his last paycheck and resigned. Therefore, Celadon claims, it never had the opportunity to confer with Kouidri about the incident.

Despite Celadon's claim that Kouidri was on vacation following Plaintiff's 5/7/01 report of sexual harassment, Kouidri appears to be on Celadon's work schedule for 5/10/01 and 5/11/01. Exhibit J to Defendant's Memorandum, Bates stamp no. C360.

5

Moreover, Celadon's Vice-President claimed in a 7/20/01 Affidavit that Kouidri had "removed himself from the work schedule" prior to the incident report by Plaintiff.

Despite Celadon's claim that it never had the opportunity to interview Kouidri concerning the incident, Celadon had Kouidri sign a separation form on 5/21/01 indicating that he was resigning. Celadon thus had ample opportunity to interview Kouidri on that occasion and before it gave him his final paycheck.

While Celadon now admits that Plaintiff and Kouidri worked together at One Kendall Square on the date of the incident (5/5/01), Defendant's Memorandum at 2, Celadon made a different claim before the MCAD. Celadon then claimed that the **only** day that Plaintiff and Kouidri worked together at that site was Sunday, 4/29/01. Celadon made that claim to attempt to demonstrate to the MCAD that Plaintiff's report of the sexual assault was untimely.

## IV. ARGUMENT

### A. The Standard of Review

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Mesnick v. General Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine, triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). A genuine issue is one "that a reasonable jury could

6

resolve . . . in favor of the nonmoving party." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). A fact is material "when [it] has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant." Parrilla-Burgos v. Hernandez-Rivera, 108 F.3d 445, 448 (1st Cir. 1997). The court must view the entire record in the light most hospitable to the nonmoving party and indulge all reasonable inferences in that party's favor. O'Connor v. Steeves, 994 F.2d 905, 907 (1st Cir. 1993).

Summary judgment is a disfavored remedy in discrimination cases. Federal courts have advocated "caution and restraint" in these cases that turn upon the issue of motive, stating that review in such cases will be "most searching." Rossy v. Roche Products, Inc., 880 F.2d 621, 624 (1st Cir. 1989); Oliver v. Digital Equipment Corp., 846 F.2d 103, 109 (1st Cir. 1988). "These difficult questions are most suited for jury determinations, as proof is generally based on inferences that must be drawn, rather than on the proverbial 'smoking gun.'" Rossy, supra. See also Reed v. Lockheed Aircraft Corp., 613 F.2d 757, 759 (9th Cir. 1980) ("Courts are reluctant to dismiss by summary judgment Title VII discrimination suits where . . . motive and intent are crucial elements and the proof is in the hands of the alleged wrongdoers.").

Massachusetts courts have similarly held that summary judgment is a disfavored remedy in the context of M.G.L. c. 151B discrimination cases because the ultimate issue of discriminatory intent is a factual question. Labonte v. Hutchins & Wheeler, 424 Mass. 813, 820 (1977); Blare v. Husky Injection Molding Sys. Boston, Inc., 419 Mass 437, 439 (1995); Brunner v. Stone & Webster Eng'g Corp., 413 Mass. 698, 705 (1992) ("where motive, intent, or other state of mind questions are at issue, summary judgment is often inappropriate"). The ultimate question of a defendant's state of mind is "elusive" and

rarely is established by other than circumstantial evidence, Wheelock College v. MCAD, 371 Mass. 130, 137 (1976), which requires the jury to weigh the credibility of conflicting explanations of the adverse employment decision.

Moreover, the Supreme Judicial Court has frequently recognized that Chapter 151B provides greater protection than its federal counterpart. See, e.g., Labonte v. Hutchins & Wheeler, 424 Mass. 813, 816 n.5 (1977) (Massachusetts courts have no obligation to follow the Federal case law in the area of Chapter 151B claims); Melnychenko v. 84 Lumber Co., 424 Mass. 285, 288 (1997) ("We arrive at our own conclusion in construing our own statute [Chapter 151B]."). Chapter 151B, by its terms, directs courts that it "shall be construed liberally for the accomplishment of [its] purposes." M.G.L. c. 151B, s. 9. Finally, Chapter 151B, s. 2 and 3 authorize the MCAD to promulgate rules and regulations to carry out the provisions of Chapter 151B and such rules and regulations are entitled to deference by the courts. Bynes v. School Committee of Boston, 411 Mass. 264, 269 (1991) (The MCAD's interpretation of its governing statute is entitled to substantial deference.).

**B.    There is A Genuine Issue For Trial Concerning Whether Plaintiff Was Subjected To A Hostile Work Environment**

Title VII makes it unlawful for an employer to discriminate "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Discrimination based on sex that creates a hostile work environment violates Title VII. Meritor Savings Bank v. Vinson, 477 U.S. 57, 66 (1986). Not all "sexually objectionable" workplace environments violate the statute; rather, only those that are both subjectively and objectively offensive are actionable. Faragher v. City of Boca Raton, 524 U.S. 775, 787

(1998).  Thus, "[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment - an environment that a reasonable person would find hostile or abusive - is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to abusive, . . . there is no Title VII violation."  Harris v. Forklift Sys., 510 U.S. 17, 21-22 (1993).  For sexual harassment to be actionable, the conduct does not have to cause a "tangible psychological injury," but it must be more than "merely offensive."  Harris, 510 U.S. at 21.  The environment must be judged by looking at all the circumstances, which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 23.  The less severe the harassing conduct, the more pervasive or frequent it must be to constitute a violation.  Ellison v. Brady, 924 F.2d 872,878 (9th Cir. 1991); Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002).

      The definition of sexual harassment under Massachusetts's law is broader than that of Title VII.  It includes any physical or verbal conduct of a sexual nature that is found to interfere unreasonably with an employee's work performance through the creation of a humiliating or sexually offensive work environment. Melnychenko v. 84 Lumber Company, 424 Mass. 285, 290 (1997).

      Even a single incident of sexual assault sufficiently alters the conditions of the victim's employment and clearly creates an abusive work environment for purposes of Title VII liability. Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2nd Cir. 1995); Noviello v. City of Boston, 398 F.3d 76, 84 (1st Cir. 2005) (single act of harassment, if egregious enough, may suffice); See Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986)

(allegations of harassment, including a claim of rape, sufficient to state a claim for hostile environment harassment).

Likewise, under Massachusetts law, a hostile environment may be established based on a single incident, due to its severity, despite the fact that the conduct is not frequent or repetitive. MCAD Sexual Harassment in the Workplace Guidelines, Section II(C)(3) (2002) ("MCAD Guidelines").[1] The MCAD's interpretation of its governing statute is entitled to substantial deference. Bynes v. School Committee of Boston, 411 Mass. 264, 269 (1991). See also Gnerre v. MCAD, 402 Mass. 502, 508-09 (1988) (rejecting any numerosity requirement under Massachusetts law for hostile work environment incidents).

In the present case, Plaintiff alleges a sexual assault at the workplace. These allegations are sufficient to create a triable issue that she was subjected to a hostile work environment.

## C.    There is A Genuine Issue For Trial Concerning Whether Celadon is Vicariously Liable for the Conduct of the Alleged Harasser

Celadon argues that it is not liable for the conduct of Kouidri because Plaintiff was mistaken in her belief that he was a supervisor. However, even if Kouidri was not Plaintiff's supervisor, Celadon may still be liable.

Employer liability for sexual harassment under Title VII may arise from apparent authority. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 759 (1998). The Court described the "usual case" of a supervisor's harassment as involving misuse of actual power, not the false impression of its existence. Id. The Court went on to say:

---

[1]    The MCAD Guidelines are attached as Exhibit A to this memorandum.

> If, in the unusual case, it is alleged there is a false impression that the actor was a supervisor, when he in fact was not, the victim's mistaken conclusion must be a reasonable one.

524 U.S. at 759.

An employer is liable for the abusive work environment created by a supervisor if the supervisor uses his actual **or** apparent authority to further the harassment, or if he was otherwise aided in accomplishing the harassment by the existence of the agency relationship. Karibian v. Columbia University, 14 F.3d 773, 780 (2nd Cir. 1994); Sharron Wright-Simmons v. Oklahoma City, 155 F.3d 1264, 1269-70 (10th Cir. 1998) (employer liable where transgressor acted with apparent authority or was aided in violating the statute by virtue of agency relationship); Tomka v. Seiler Corp., 66 F.3d 1295, 1305 (2nd Cir. 1995); Johnson v. Plastic Packaging, Inc., 892 F. Supp. 25, 29 (D. Mass. 1995) (citing Karibian, supra).

Likewise, under Massachusetts law, vicarious liability for sexual harassment may be based on apparent as well as actual authority. MCAD Guidelines, Section III(B) (with footnoted authority). That guideline states:

> The employer may be vicariously liable for sexual harassment even if the alleged harasser is not formally designated as a supervisor and even if a supervisor lacks actual authority, under the doctrine of apparent authority. Liability under these circumstances exists when the harasser holds himself out to the employee as having supervisory authority over the employee. The employee's belief that the harasser has authority over her, to the extent that it is reasonable, may be a significant factor in determining the existence of apparent authority.

In the present case, Plaintiff has presented evidence that she believed that Kouidri was a supervisor. This was based on the fact that he wore street clothes, rather than a security uniform, on the two occasions that she encountered him. In addition, on the

11

previous encounter, he gave her orders. Kouidri also, unlike Plaintiff, had a walkie-talkie. Kouidri, by his dress and manner, held himself out as having supervisory authority over Plaintiff. Moreover, at the time of the assault, she was instructed to accompany Kouidri on a tour of the building. It was this tour that provided Kouidri with the opportunity to lure Plaintiff to a secluded location where he accomplished his sexual assault. Plaintiff submits that these allegations are sufficient to create a triable issue that Kouidri was a supervisor under the principle of apparent authority.

**D.   Massachusetts Law Does Not Provide Celadon with An Affirmative Defense**

Under Chapter 151B, an employer is unconditionally liable for sexual harassment by its supervisors. College-Town v. M.C.A.D, 400 Mass. 156, 165 (1987). Under Massachusetts law, an employer's remediation does not bar liability for harassment committed by a supervisor. Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005); Morehouse v. Berkshire Gas Co., 989 F. Supp. 54, 64 (D.Mass. 1997); Messina v. Araserve, Inc., 906 F. Supp. 34, 37 (D.Mass. 1995) (whether alleged harasser had actual or apparent authority over plaintiff was a question of fact). Accordingly, if Kouidri is deemed Plaintiff's supervisor, Celadon would be liable for his behavior, regardless of any remediation on its part.

**E.   There is A Genuine Issue For Trial Concerning Whether Celadon Took Adequate Remedial Action Following the Incident**

Under Title VII, when a supervisor creates a hostile work environment, the employer is vicariously liable for it, subject, however, to a possible affirmative defense. This defense, familiarly known as the *Faragher/Ellerth* defense, consists of two elements which, if proven, permit the employer to avoid liability. First, the employer must show that it "exercised reasonable care to prevent and correct promptly" the harassment.

12

Second, the employer must show that the employee "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Noviello v. City of Boston, 398 F.3d 76, 94-95 (1st Cir. 2005).

In the present case, Celadon admits that it did not provide any sexual harassment training to its employees during any timeframe relevant to this litigation. Moreover, the facts reveal that failed to take any action to investigate Plaintiff's allegations, despite a clear opportunity to do so. The only "remedial" action taken by Celadon was to transfer Plaintiff to a less advantageous assignment with lower pay.

**F.     There is A Genuine Issue For Trial Concerning Whether Plaintiff Was Subjected To Retaliation Based On Her Complaint of Sexual Harassment**

Plaintiff submits that there is a genuine issue for trial that she was subjected to retaliation for engaging in conduct protected by Title VII and M.G.L. c. 151B.

The anti-retaliation provisions of Title VII state that:

> [i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].

42 U.S.C. § 2000e-3(a).

Similarly, Chapter 151B provides that it is an unlawful practice "[f]or any person [or] employer . . . to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under [Chapter 151B]," § 4(4), or "[f]or any person to coerce, intimidate, threaten, or interfere with another person in the exercise or enjoyment of any right granted or protected by [Chapter 151B]," § 4(4A).

13

To demonstrate a retaliation claim under either statute, the plaintiff must establish that (1) she engaged in protected conduct; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). As a matter of law, Plaintiff's retaliation claim may be viable even if the underlying discrimination claim is not. Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174-75 (1st Cir. 2003); Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991); Abramian v. President & Fellows of Harvard Coll., 432 Mass. 107, 121-22 (2000). Moreover, the employment activity or practice that Plaintiff opposed need not be a Title VII violation so long as Plaintiff had a reasonable belief that it was, and she communicated that belief to her employer in good faith. Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 261-62 (1st Cir. 1999).

There are many sources of circumstantial evidence that, theoretically, can demonstrate retaliation in a way sufficient to leap the summary judgment or directed verdict hurdles. Mesnick, 950 F.2d at 827. These include, but are not limited to, evidence of differential treatment in the workplace, Sumner v. United States Postal Serv., 899 F.2d 203, 210 (2d Cir. 1990); Dominic v. Consolidated Edison Co., 822 F.2d 1249, 1254-55 (2d Cir. 1987); temporal proximity of an employee's protected activity to an employer's adverse action, Rowlett v. Anheuser-Busch, Inc., 832 F.2d 194, 202 (1st Cir. 1987); Sumner, 899 F.2d at 209; and comments by the employer which intimate a retaliatory mindset. Mesnick, 950 F.2d at 827. Whatever the sources of his proof, a plaintiff, in order to survive judgment as a matter of law, must present evidence from which a reasonable

jury could infer that the employer retaliated against him for engaging in protected activity. Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 1990).

  Federal courts have recognized the difficulty of disposing of issues of discriminatory or retaliatory intent at the summary judgment stage, particularly after a plaintiff establishes a prima facie case. Hossaini v. Western Missouri Medical Center, 97 F.3d 1085 (8th Cir. 1996) (grant of summary judgment on retaliation claim inappropriate because case is based largely on circumstantial evidence and the relative merit of each party's case depends significantly on credibility); Davis v. Fleming Companies, Inc., 55 F.3d 1369 (8th Cir. 1995). "Summary judgments should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion. All the evidence must point one way and be susceptible of no reasonable inferences sustaining the position of the nonmoving party." Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991); Gill v. Reorganized Sch. Dist. R-6, Festus, Missouri, 32 F.3d 376, 378 (8th Cir. 1994)(reviewing summary judgment "with caution in employment discrimination cases . . . because intent is inevitably the central issue"). "There will seldom be `eyewitness' testimony as to the employer's mental processes." U.S. Postal Service Bd. Of Governors v. Aikens, 460 U.S. 711, 716 (1983); See Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003) (summary judgment on retaliation claim reversed where a reasonable juror could infer that Defendant's claim of insubordination masked retaliatory motives).

  In the present case, Plaintiff clearly engaged in protected activity on 5/7/00 by complaining of sexual harassment by Defendant Kouidri. The issue is whether Plaintiff was subjected to an adverse employment action as a result.

### a. Adverse Employment Action

Adverse employment actions include "demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees." Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir. 1998); MacCormack v. Boston Edison Co., 423 Mass. 652, 662 (1996) (stating that a plaintiff must establish a "change in working conditions which materially disadvantaged him"); Ritchie v. Department of St Police, 60 Mass. App. Ct. 655, 665 (2004) (Prohibited retaliatory actions are those that constitute a change in working conditions that "create a material disadvantage in the plaintiff's employment."). Whether an employment action is adverse is measured by an objective standard. Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002); MacCormack, 423 Mass. at 663. For an employment action to be adverse, "the employer must either (1) take something of consequence from the employee, say, by discharging or demoting her, reducing her salary, or divesting her of significant responsibilities or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering her for a promotion after a particular period of service." Blackie v. Maine, 75 F.3d 716, 725-26 (1st Cir.1996) (citations omitted). The "creation and perpetuation of a hostile work environment" can also constitute a retaliatory adverse employment action under Title VII and Chapter 151B. Noviello, 398 F.3d at 88.

The basis for liability under M.G.L.c. 151B, § 4(4A) is broader than liability under § 4(4) or Title VII. Bain v. City of Springfield, 424 Mass. 758, 765 n.4 (1997); Melnychenko v. 84 Lumber Company, 424 Mass. 285, 294-95 (1997) The Bain Court stated:

16

>Although we often look to analogous Federal law in construing our own antidiscrimination statute, <u>Tate v. Department of Mental Health</u>, 419 Mass. 356, 361 (1995), <u>Cox v. New England Tel. & Tel. Co.</u>, 414 Mass. 375, 382 (1993), in this case, our c.151B, § 4 (4A) (may not "coerce, intimidate, threaten, or interfere"), is much more specific than Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 (1994) (may not "discriminate against"), and we may well find liability under c.151B even if the same conduct would not be actionable under TitleVII.

424 Mass at 765 n.4.

The MCAD Guidelines echo this broader liability standard under Section 4(4A). MCAD Guidelines, Section IX(B) provides that an employer takes adverse action under § 4(4) when it materially disadvantages the complainant with regard to any of the terms or conditions of her employment. It states that adverse action for purposes of retaliation can encompass actions such as denial of promotion; demotion in title or duties; transfer to a less favorable position or location, involuntary placement on leave; hostile or abusive workplace treatment; or decreasing compensation or benefits. See <u>Farricy v. Suffolk County Sheriff's Dep't</u>, 22 MDLR 27, 28-29 (2000)(transfer to a less favorable position); <u>Muise v. Credit Exchange</u>, 17 MDLR 1684, 1691-92 (1995) (hostile or abusive workplace treatment).

MCAD Guidelines, Section IX(B) also provides that, in addition to actions that are materially disadvantageous, retaliation claims can be based upon allegations of coercion, threats, intimidation, and interference under chapter 151B, §4(4A). In turn, MCAD Guidelines, Section IX(C) provides:

>Coercion, Intimidation, Threats or Interference
>
>A complainant may also bring a retaliation claim under §4(4A) of chapter 151B if she is subjected to threats, intimidation, or coercion, or her employment is otherwise interfered with because she complained of harassment. **Unlike a §4(4) claim, a §4(4A) claim does not require proof of an adverse employment action**. (Emphasis added).

17

There is sufficient evidence in this case to permit a jury to conclude that Plaintiff reasonably and in good faith believed that Kouidri had sexually harassed her, that her internal complaint to Celadon was a reasonable response to her belief, and that Celadon took adverse action against her as a result. Plaintiff was transferred by Celadon to a less advantageous assignment with lower pay. Celadon, despite its denial, failed to provide Plaintiff with an operable telephone at the site. In addition, Celadon left Plaintiff stranded at that remote site on her last date of work.

While Celadon may argue that its actions were not intentional or were innocent mistakes, the evidence shows that Celadon has been guilty of pretext on several material assertions. Celadon boldly asserts it had no opportunity to interview Kouidri regarding the incident, though the evidence suggests the contrary. Celadon asserts that Kouidri was on vacation after the incident, while the evidence suggests that Kouidri took himself off the work schedule instead. While Celadon now admits that Plaintiff and Kouidri worked together at One Kendall Square on the date of the incident (5/5/01), Celadon previously claimed that the **only** day that Plaintiff and Kouidri worked together at that site was Sunday, 4/29/01. While Celadon denies that Plaintiff had an inoperable telephone at the Marina Bay site, the evidence suggests otherwise. Celadon denies that it promised Plaintiff a telephone, while Plaintiff swears that it did. If Plaintiff is believed, this is evidence of pretext. Celadon asserts that Plaintiff was mistaken in her belief that her work hours on her last day ended at midnight. Plaintiff states that she was specifically told that was the schedule. Finally, Celadon asserts that it attempted to interview Plaintiff regarding the incident, but Plaintiff failed to cooperate. Plaintiff denies that any such attempt was made. If Plaintiff is believed concerning these matters, there is evidence of

18

pretext and inconsistencies on Celadon's part. Since there are serious questions concerning the credibility of many of Celadon's assertions, there are material issues of fact for a jury to determine.

## V. CONCLUSION

WHEREFORE, Plaintiff respectfully requests this Honorable Court to deny Defendants' motion for summary judgment in all respects. Plaintiff has created triable issues that she was subjected to sexual harassment and sex discrimination and that she was subjected to retaliation in response to her complaint of sexual harassment.

    Respectfully Submitted,

    MARY NEWELL,

    By her attorney,

    /s/ Richard A. Mulhearn_____
    Richard A. Mulhearn
    BBO #: 359680
    Law Office of Richard A. Mulhearn, P.C.
    41 Elm Street
    Worcester, MA 01609
    Tel: (508) 753-9999

Dated: July 14, 2005.