UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARY NEWELL,                           )
     Plaintiff,                        )
                                       )
v.                                     )     DOCKET NO.  04-10429-JGD
                                       )
CELEDON SECURITY SERVICES, INC.,  )
RODNEY BUTLER, KEITH GREEN;            )
AND ABEDEKADER KOUIDRI,                )
     Defendants.                       )

### AFFIDAVIT OF MARY NEWELL

Mary Newell, upon her oath, deposes and says:

1.      I am the Plaintiff in this action.

2.      I make this Affidavit in opposition to the motion for summary judgment of Defendant Celadon Security Services ("Celadon").

3.      I was employed by Celadon as a security guard from December 2000 to May 2001.

4.      I had no previous experience as a security guard and I received no training to speak of from Celadon.

5.      My immediate supervisor for most of my employment at Celadon was Defendant Rodney Butler. He gave me my work assignments. However, he did not work at the sites with me.

6.      On 5/5/01, I was sexually assaulted at a work site by Defendant Kouidri. Kouidri was an employee of Celadon. The work site was One Kendall Square. I worked a double shift that day. During the second shift, I was asked by the older security guard on the site to accompany Kouidri on a tour of the building so that I would know what to do in case I had to work alone. During this tour, Kouidri brought me to the basement in a poorly lit area. Kouidri grabbed my breast. I pushed him away. He then pushed me against the wall and kissed me.



7.     I believed that Kouidri was a supervisor at Celadon.  Kouidri wore street clothes instead of a security uniform like the security guards wore.  I had seen Kouidri once before at the same site.  Kouidri wore street clothes then as well.  My experience at Celadon was that supervisors did not wear security uniforms.

8.     Kouidri acted like a supervisor on the earlier occasion.  At that time, when I left my desk to get a soda, Kouidri yelled at me and ordered me to return to my desk.  He told me that I was supposed to sit there and stay there.  He was very pushy.  He acted like a supervisor.  He also walked around with a walkie-talkie.  I was never given a walkie-talkie by Celadon.

9.     I reported the sexual assault to Celadon two days later on 5/7/01.  I reported it to a supervisor of Celadon named Frank Doran.  I believe that I also reported it to my immediate supervisor Rodney Butler.

10.    On the day after I reported the sexual assault, I was transferred to a different site, Seaport Condominium at Marina Bay in Quincy ('Marina Bay").  This site was very difficult to get to by public transportation during the day and there was no public transportation to get home at the end of the shift.  It was known to Celadon that I did not have a car and had to rely on public transportation.  Rodney Butler arranged for another supervisor, Defendant Keith Green, to pick me up at the end of the shift to take me home to Dorchester.

11.    I was told by Rodney Butler that my hours at Marina Bay were 5:00 p.m. to midnight.  I would be working alone at the site.  I worked at Marina Bay from Tuesday, 5/8/01 through Friday 5/11/05.  I made my way there each day by public transportation.  On each night from 5/8/01 to 5/10/01, Mr. Green picked me up, arriving at approximately 11:30 p.m.

12.    There was a telephone that I could use at Marina Bay. However, the telephone was not working properly. By Thursday, the telephone was not working at all. I spoke with Rodney Butler during the day on Friday, 5/11/01, and told him that the phone was not working at Marina Bay. Rodney Butler promised that he would have a phone there for me when I arrived to work that night.

13.    When I arrived to work at Marina Bay, there was no phone as promised by Rodney Butler. I continued to work from 5:00 p.m. on. Mr. Green did not arrive to pick me up at the usual time of 11:30 p.m. I continued to wait for him until approximately 12:45 p.m., but he did not show. I had no way to call anyone. I was stranded there and was very worried and upset. At approximately 12:45 p.m., I started to walk home to Dorchester.

14.    My attempt to walk home alone at that late hour and in that unfamiliar area was very frightening to me. There were motorcycles going by and dangerous looking people. I was afraid for my safety. I eventually made my way to a nursing home in the area. I had no money for cab fare. I was able to call my friend Louis Young from the nursing home. I arranged with him to take a cab to his home and for him to pay for the cab.

15.    Celadon has claimed in this case that it tried to investigate my sexual harassment complaint by trying to schedule an interview with me after I reported it. This is untrue. I was never contacted for an interview. I was never told what happened as a result of my complaint. The only words spoken to me by Celadon concerning the sexual assault by Kouidri was a statement by Rodney Butler telling me not to mention it to the people at Marina Bay.

16.     Celadon's transfer of me to Marina Bay after my complaint was disadvantageous to me. The site where I had worked, One Kendall Square (as well as other sites where I had worked) was accessible by public transportation. There were other security guards working there. There was also the opportunity to work double shifts and make more money. At Marina Bay, it was very difficult to get there by public transportation and there was no public transportation to get home. I had to rely on Celadon to pick me up. I worked alone and had no operable phone. There were no double shifts available there for extra money.

17.     There was no reason that I could see why transferring me to another site following my complaint was necessary. I received no explanation from Celadon regarding why that was necessary.

18.     I was very traumatized by these experiences at Celadon. I suffered a severe deterioration in my mental health condition and had to be hospitalized. A psychiatric evaluation of me dated 5/13/05 (Exhibit B) states that these events caused a worsening in my medical condition and an inability to maintain regular employment for approximately one year.

        Signed under the penalties of perjury this 14th day of July.


                                        *Mary Newell*
                                        Mary Newell

4

## PSYCHIATRIC EVALUATION

RE:    Newell, Mary

DATE:  05/13/05

I performed a psychiatric evaluation of Ms. Mary Newell at the request of her attorney, Mr. Richard Mulhearn. I met with Ms. Newell for 1 hour and 40 minutes on April 12, had the opportunity to speak with her current psychiatrist, Dr. Alia Abbas, as well as her therapist, Judy Skolnick, and I have reviewed discharge summaries from prior psychiatric admissions at the Bournewood Hospital in the Beth Israel Deaconess Medical Center. I have also reviewed treatment notes of several prior physicians, including Dr. Tina Lusignolo, Dr. Kara Ditto, Dr. Katherine Wellington, and Dr. Christine Kim. I have also reviewed an initial treatment evaluation from Cynthia Wallace, her Healthcare Associates social worker.

CIRCUMSTANCES OF THE EVALUATION: Mr. Mulhearn asked me to evaluate Ms. Newell to see whether the events that Ms. Newell alleges occurred on her job for the Celadon Company in May of 2001 may have contributed to an exacerbation of her underlying psychiatric condition, which may have led to her inability to work.

CURRENT SITUATION: Mary Newell is a 52-year-old never-married woman, originally from Ireland, who has suffered from a major mental illness roughly since age 16.

Currently living alone in subsidized housing in Boston, she receives disability payments, and her days are mostly spent either seeing her friend, Louis, or playing with her beloved cat, who is quite old and not expected to live much longer.

Ms. Newell was described in treatment notes by Dr. Posever at the Lemuel Shattuck Hospital in July 2000 as having "well compensated schizophrenia, without psychosis." She remembers having remained out of psychiatric facilities for many years prior to 2001. In May 2001, she alleges that she was sexually harassed by a fellow employee for the Celadon Corporation. She claims that after reporting this event, she was transferred to a different location in Quincy. Several days later, she alleges that she was told that she would be given a cell phone, which never arrived, and that she would be picked up from an evening shift, which allegedly did not happen. As a result, she was left alone in Quincy late at night and wandered around looking for help and was quite frightened by this experience.

Following that episode, she feels that her mental health worsened considerably. She became quite depressed and frightened and began drinking again to manage her distress.

Her condition clearly deteriorated as documented in treatment notes from BIDMC of that year, and she was psychiatrically hospitalized in late 2001 as well as early 2002, for symptoms of psychosis and depression.



Although she tried working at one or two jobs in 2001, she was unable to stay on them because of her severe anxiety and difficulty trusting others, which she ascribes to be events of May 2001.

Since then she has really been unable to hold regular employment, which she had formerly enjoyed. Her symptoms seem to have fluctuated over the years and are now relatively stable, although she does claim to have residual difficulty sleeping and some anxiety and difficulty trusting others. Much of her concern now is focused on the health of her cat, which is quite ill.

PAST PSYCHIATRIC HISTORY: Ms. Newell had several prior psychiatric admissions prior to the ones mentioned above, although she had been out of psychiatric facilities for at least five years and possibly closer to 10 years. She has been on a variety of medications in the past, and did particularly well on Geodon. She has been diagnosed with different conditions in the past, most typically in the schizophrenic or schizoaffective disorder spectrum.

PAST MEDICAL HISTORY: Fairly unremarkable. She has had back and neck surgery and has had a benign tumor removed from her cheek.

CURRENT MEDICATIONS: Geodon 120 mg b.i.d. and Trilafon 6 mg or 12 mg q.h.s. in addition to Nexium.

SOCIAL HISTORY: She was born and raised in Ireland and has one surviving brother from an original total of three siblings. Her father died in 1997 and her parents had separated when she was 16. She describes herself as having been a slow learner, who attended vocational school for three years but did not obtain a GED degree. She has lived in the United States since age 16, always in Boston.

She has never married, has no children, but does have a male friend currently. She has done security work, has worked in a supermarket fish department, worked in a laundry at a nursing home for a few weeks and in the kitchen of a local rehab hospital for two years. Her longest job was in the canteen of the Shattuck Hospital for 10 years many years ago. Her job at Celadon started in 2000 and she initially loved her work when she was stationed in Watertown.

She has a history of drinking to excess, which was quite problematic in the aftermath of the events of May 2001. Currently she reports sobriety for the past three years and has never abused other drugs.

MENTAL STATUS EXAMINATION: She presented as a simply dressed and groomed woman, polite, friendly, easy to engage, who was quite anxious and spoke in a clipped, anxious way. Her thinking was somewhat stereotyped but was linear, goal directed, and somewhat concrete. She denied hallucinations currently, and described more fear of other people than frank delusional paranoia. She was alert and oriented, seems to be of average intelligence, interpreted proverbs abstractly and was cognitively intact.

OPINION: Ms. Newell suffers from a psychotic spectrum illness, either schizophrenia or schizoaffective disorder, most likely the latter. Alcohol abuse has complicated her condition in

2

the past, but is currently in remission. It appears both from the record and from her own accounts that she was psychiatrically stable and had been out of the hospital for many years until 2001, when the events at work led her to feel quite frightened, traumatized, unable to trust others, and more symptomatic. Treatment records document that her condition was quite bad for at least one year after May 2001, during which time she was hospitalized twice psychiatrically for psychotic behavior.

Currently she is quite emphatic that the events of Celadon were unquestionably causal in her worsening symptoms and that the memory of them continues to trouble her. I think that the records suggest that, to a reasonable degree of medical certainty, the events at Celadon of May 2001 were the primary reason why her condition worsened dramatically that year, which led to her inability thereafter to maintain regular employment for a period of approximately one year.

Respectfully submitted,

Michael W. Kahn, M.D.

3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARY NEWELL,
          Plaintiff,

v.

CELADON SECURITY SERVICES,
INC., RODNEY BUTLER, KEITH
GREEN, AND ABEDEKADER
KOUIDRI,
          Defendants.

CIVIL ACTION NO.:
04-10429-JGD

### DEFENDANT CELADON SECURITY SERVICES, INC.'S ANSWERS TO FIRST SET OF INTERROGATORIES PROPOUNDED BY THE PLAINTIFF MARY NEWELL

Pursuant to Federal Rules of Civil Procedure 26 and 33, Defendant Celadon

Security Services, Inc. ("Celadon"), by their undersigned attorneys, object and respond to

Plaintiff Mary Newell's ("Newell") Interrogatories Propounded to Celadon (the

"Interrogatories") as follows:

### **GENERAL OBJECTIONS**

These objections are incorporated into each of Celadon's specific objections as if

fully set forth therein:

1.      Celadon objects to the Interrogatories to the extent they seek information

already in Newell's possession and/or readily accessible to Newell.

2.      Celadon objects to the Interrogatories to the extent they seek information

that is equally available to Newell through other sources, on the grounds that such

Interrogatories subject Celadon to unreasonable and undue burden and expense.



EXHIBIT
C

responses to these interrogatories, and provide a brief summary of each person's contribution.

## ANSWER NO. 2

Celadon incorporates by reference the General Objections set forth above.

Without waiving and subject to its objections, Celadon states that Robert Burnham,

Administrative Manger of Celadon assisted in providing responses to these

Interrogatories.  Mr. Burnham's assistance was limited to locating documents that were

useful in compiling answers to these interrogatories.

## INTERROGATORY NO. 3

Please itemize all wages and compensation (including hourly wages, overtime, salary, draw, commissions, bonuses, salary incentives, and other monetary compensation) paid to Plaintiff **for each week** of her employment with you.

## ANSWER NO. 3

Celadon incorporates by reference the General Objections set forth above.  In

addition, Celadon further objects to the Interrogatory as seeking information already in

Newell's possession and, in accordance with Fed. R. Civ. P. 33(d), Celadon refers Newell

to the documents it has produced to date, including without limitation the documents bate

stamp nos. C008-C009.

## INTERROGATORY NO. 4

If Plaintiff's wages differed in any given week based on the location that she was assigned to work or the hours that she was assigned to work, please describe fully, including the hourly rate for each such location to which she was assigned, the reason for any difference in hourly wages and the identity of all documents concerning Plaintiff's hourly wages at each work location during her employment with you.

## ANSWER NO. 4

Celadon incorporates by reference the General Objections set forth above.  In

addition, Celadon further objects to the interrogatory as seeking information already in

Newell's possession and, in accordance with Fed. R. Civ. P. 33(d), Celadon refers Newell
to the documents it has produced to date.

Subject to and without waiving the foregoing objections, Celadon states that
Plaintiff's wages did not differ in any given week based on the location or particular
hours that she was assigned to work. The only instance in which Plaintiff was paid other
than her normal $8.50 hourly wage was during training sessions, for which she was paid
minimum wage. This difference in wages represents standard Celadon policy, is
reflected in the documents previously provided to Plaintiff, was applicable to Newell
(and other all Celadon employees) throughout the term of her employment with Celadon,
and remains in effect as of the date hereof.

**INTERROGATORY NO. 5**

Please itemize each employment benefit (e.g., medical, dental, life or disability
insurance benefit, 401(k) plan benefits, retirement or pension benefits) applicable to
Plaintiff during her employment with you and for each such benefit please set forth
monthly monetary cost of each employment benefit, the amount of such monthly cost
paid by you and the amount of such monthly cost paid by Plaintiff.

**ANSWER NO. 5**

Celadon incorporates by reference the General Objections set forth above.
Subject to and without waiving such objections, Celadon states that Plaintiff, as a full
time employee, was entitled to receive health insurance. The cost for such health
insurance would be split equally between Celadon and the Plaintiff. Celadon states,
however, that Plaintiff declined to participate in Celadon's health insurance program
while employed with Celadon. The current cost for such health insurance is $364 per
month and such cost is shared equally by Celadon and the participating employees.

**INTERROGATORY NO. 20**

Describe fully any investigation conducted by you (or on your behalf) of any and all allegations of sexual harassment and/or inappropriate behavior made by Plaintiff against Defendant Kouidri, including what was done, by whom, when, the results of the investigation, and the identity of all documents concerning the investigation.

**ANSWER TO NO. 20**

Celadon incorporates by reference the General Objections set forth above.

Subject to and without waiving such objections, Celadon states that Newell did not report

this alleged incident to Celadon. Rather, Newell informed a fellow security officer,

Marion Granger, who in turn informed Francis Doran, site supervisor for One Kendall

Square. Specifically, Celadon's third-person understanding of the events that transpired

were that another security officer, Defendant Kouidri, had "brushed up against her while

on tour of the premises". Mr. Doran, in turn, reported this to Defendant Butler in his

capacity as account manager. Subsequently, Defendant Butler asked Newell why she had

waited so long to report the incident and she replied that a similar incident had happened

to her while she was employed at Stop & Shop and that no action was taken by Stop &

Shop. She also stated that she thought Celadon should be aware of the incident.

As soon as Defendant Butler completed this telephone conversation with Newell,

he reported the incident to Steven Zuchowski, who is the Vice President of Celadon and

responsible for handling all employment matters. Mr. Zuchowski asked Defendant

Butler to contact Newell immediately and arrange a meeting either that same day or the

next day to formally inquire into and investigate the allegation. Defendant Butler

contacted Newell and scheduled a meeting between the three of them for the next day.

However, Newell did not show up for the meeting. Defendant Butler called and paged

her at least three times to inquire as to why she did not come into the office. She never returned his calls.

At the time Defendant Butler contacted Newell regarding the alleged incident, Defendant Kouidri was on vacation and therefore, Celadon had planned to meet with him upon his return to discuss the incident. However, instead of returning from vacation, he simply picked up his last paycheck and resigned from Celadon. Therefore, Celadon never had the opportunity to confer with him about the incident.

Furthermore, Newell did not reference the alleged incident in her signed Separation Form which she gave to Celadon when she voluntarily resigned from the employ of Celadon. In light of these facts, Celadon was unable to conduct a thorough formal investigation. See also the affidavits of Steven Zuchowski and Rodney Butler which are attached hereto as Exhibits A and B, respectively.

**INTERROGATORY NO. 21**

For each person that was interviewed by you (or on your behalf) as part of any investigation conducted by you (or on your behalf) of any and all allegations of sexual harassment and/or inappropriate behavior made by Plaintiff against Defendant Kouidri, please set forth when and by whom they were interviewed, what such person stated and the identity of all documents concerning such person's interview.

**ANSWER TO NO. 21**

Celadon incorporates by reference the General Objections set forth above. Subject to and without waiving such objection, Celadon refers Newell to Answers No. 19 and 20 above. In addition, in accordance with Fed. R. Civ. P. 33(d), Celadon refers Newell to the documents it has produced to date.

15

## INTERROGATORY NO. 22

Please describe fully all communications or attempted communications between Plaintiff and you concerning any investigation by you of allegations of sexual harassment and/or inappropriate behavior made by Plaintiff against Defendant Kouidri, including for each communication or attempted communication, when it was made, who made it, how it was made (e.g., in person, in writing or by phone) what was communicated, and the identity of all documents concerning such communications or attempted communications.

## ANSWER TO NO. 22

Celadon incorporates by reference the General Objections set forth above.

Subject to and without waiving such objection, Celadon refers Newell to Answers No. 19

and 20 above. In addition, in accordance with Fed. R. Civ. P. 33(d), Celadon refers

Newell to the documents it has produced to date.

## INTERROGATORY NO. 23

Describe fully all sexual harassment training provided by you or on your behalf to your employees (including without limitation to Defendants Butler, Green and Kouidri), including in your description when such training was provided, who provided it, the nature of the training provided and the identity of all documents concerning such training that was provided.

## ANSWER TO NO. 23

Celadon incorporates by reference the General Objections set forth above.

Subject to and without waiving such objections, Celadon states that it did not provide

sexual harassment training to its employees during any timeframe that is relevant to this

litigation.

## INTERROGATORY NO. 24

Describe fully the time that Defendant Green picked up Plaintiff at Seaport Condominiums for each day that Plaintiff was assigned there and identify all documents concerning the time that Green picked Plaintiff up.

## ANSWER TO NO. 24

Celadon incorporates by reference the General Objections set forth above.

Subject to and without waiving such objections, Celadon refers Newell to its Answer to

Interrogatory No. 11 above. In addition, in accordance with Fed. R. Civ. P. 33(d),

Celadon refers Newell to the documents it has produced to date.

## INTERROGATORY NO. 25

With regard to Plaintiff's contention that she was not provided with a cell phone
while assigned to work at Seaport Condominiums, state whether Plaintiff was promised
a cell phone by you and describe fully why she was not provided with one.

## ANSWER TO NO. 25

Celadon incorporates by reference the General Objections set forth above.

Subject to and without waiving such objections, Celadon states that Newell was not

promised a cell phone by any employee of Celadon authorized to provide same and that

Celadon has never previously provided cell phones to any security officers. Celadon has

provided cell phones to specific sites to which it was providing security, however this

was solely limited to instances in which the site itself did not have a phone. Seaport had

a phone, and therefore Celadon did not provide a cell phone at this site.

## INTERROGATORY NO. 26

Please identify all insurance policies that may be available to satisfy any judgment
for damages that may be awarded in this action against you, including in your answer the
policy limits and any applicable exclusions.

## ANSWER TO NO. 26

Celadon incorporates by reference the General Objections set forth above. In

addition, Celadon object on the basis of Rule 33 of the Federal Rules of Civil Procedure,

which limit a party to 25 written interrogatories, including all discrete subparts. Subject

## CERTIFICATION

I, Steven T. Zuchowski, state under the penalties of perjury: that I am Vice President of Celadon Security Services, Inc. ("Celadon"); that I have read the foregoing Answers to Interrogatories; that I am signing these Answers to Interrogatories in my representative capacity of the corporation; that said answers were prepared with the assistance and advice of counsel and employees of Celadon, upon whose assistance and advice I have relied; that the answers set forth herein are not necessarily based upon my personal knowledge; that the answers set forth herein, subject to inadvertent or undiscovered errors, are based on and therefore necessarily limited by the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of these answers; that the Celadon reserves the right to make any changes in the answers if it appears at any time that omissions or errors have been made therein or that more accurate information is available; that subject to the limitations set forth herein the said answers are true to the best of my knowledge, information and belief.

Steven T. Zuchowski

As to objections:

Edward D. Kutchin, Esq.
BBO No. 281920
Kerry R. Northup, Esq.
BBO No. 633016
Kutchin & Rufo, P.C.
155 Federal Street
Boston, MA  02110-2210
(617) 542-3000

## CERTIFICATE OF SERVICE

I, Edward D. Kutchin, Esq., hereby certify that on this date I served a true and correct copy of the foregoing by mailing a copy of same, postage prepaid, to Richard A. Mulhearn, Esquire, Law Offices of Richard A. Mulhearn, 41 Elm Street, Worcester, MA 01609.

Dated: March _3_ , 2005

Edward D. Kutchin

Z:\3687\Pleadings\Answers to Interrogatories.doc

# KUTCHIN & RUFO, P.C.

COUNSELLORS AT LAW

175 FEDERAL STREET

BOSTON, MASSACHUSETTS 02110-2210

(617) 542-3000

FACSIMILE (617) 542-3001

July 20, 2001

VIA HAND DELIVERY

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
One Ashburton Place
Boston, MA 02108

> Re:   Mary Newell vs. Celadon Security Services, Inc.
>        MCAD Docket No.: 01131482

Dear Ms. Jean-Francois:

Please be advised that this law firm represents Celadon Security Services, Inc.("Celadon"). In connection with the above matter, we have reviewed the Complaint and Charge of Discrimination (collectively "Complaint") filed by Mary Newell against Celadon for claims of employment discrimination based upon gender and constructive discharge, all in violation of Mass. Gen. L. c. 151B. Celadon denies the allegations contained in Ms. Newell's Complaint, submits this Position Statement as its answer to the Complaint pursuant to 804 CMR Sec. 1.10(8)(a), and suggests that the claims are specious and lack merit.

The following sets forth a brief outline of Celadon's response to Ms. Newell's Complaint:

I.    *Allegations of Complainant*:  A restatement of Ms. Newell's allegations as set forth in the Complaint;

II.   *Counter Statement of Facts and Response to Allegations of Complainant*: Celadon's statement of the facts set forth chronologically from the date Ms. Newell began to work for Celadon through the date she voluntarily resigned and it's response to each of Ms. Newell's allegations as set forth in the Complaint;

III.  *Celadon's Duty to Investigate and Take Prompt Remedial Action*: Celadon promptly investigated each allegation and took appropriate remedial action;

IV.   *Sexual Harassment*:  The alleged harasser was not Ms. Newell's supervisor and Celadon immediately investigated and took prompt remedial action.

**EXHIBIT**

tabbies®

D

# KUTCHIN & RUFO, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 2

V.  *Constructive Discharge*: Celadon promptly investigated each allegation, took appropriate remedial action, the working conditions were not unusually aggravated, did not amount to a continuous pattern, and were not intolerable. Ms. Newell, therefore, was not constructively discharged;

VI.  *Retaliation*: Ms. Newell was not subjected to a hostile work environment and was not retaliated against by Celadon;

VII.  *Gender Discrimination*: Ms. Newell was not discriminated against based upon her gender;

VIII.  *General Defenses*: Celadon asserts numerous defenses which bar Ms. Newell's claims; and

IX.  *Conclusion*: Ms. Newell's Complaint should be dismissed for lack of probable cause.

I.    Allegations of Complainant

On or about December 11, 2000, Ms. Newell was hired by Celadon. Ms. Newell makes numerous allegations in which she states she was discriminated against based upon gender and was constructively discharged. The following are the specific allegations made by Ms. Newell in her Complaint:

1.    Ms. Newell alleges that: She is the Complainant in this matter.

2.    Ms. Newell alleges that: On or about 5/11/01 she left her position as a security guard with Celadon under constructive discharge.

3.    Ms. Newell alleges that: She was discriminated against on account of her sex, Female, and retaliation for reporting an incident of sexual harassment. She was employed with the Respondent for approximately five months as a Security Guard.

4.    Ms. Newell alleges that: During her employment she was assigned to various sites for the Respondent.

5.    Ms. Newell alleges that: In or around early 5/01, she was working over-time at 1 Kendall Place in Cambridge, MA on the 4:00 p.m. to 12:00 a.m. shift. While working at this site, she was harassed by a foreign employee of Celadon who was never in uniform. She thought he was a supervisor because he was always giving her orders, and was very pushy because she was the only woman at the site.

6.    Ms. Newell alleges that: Around 11:00 p.m. that night, he took her on a tour of the premises. He brought her to the basement which was very dark and then

## KUTCHIN & RUFO, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 3

sexually assaulted her. She was subjected to inappropriate, unwanted touching. He grabbed her breast, and she pushed him away. He then pushed her up against the wall and kissed her. She tried to get away from him and feared for her safety. She reported this incident to Celadon's management. The man who sexually assaulted her was terminated.

7.    Ms. Newell alleges that: She was then placed at another site, Marina Bay, working from 5:00 p.m. to 12:00 a.m., where she had to be picked up by a road supervisor because there was no public transportation available.

8.    Ms. Newell alleges that: On or about 5/11/01, she finished her shift at 12:00 a.m. She waited until 12:45 a.m. and nobody came to pick her up. She was left stranded at Marina Bay by herself without a phone and left in a dangerous environment.

9.    Ms. Newell alleges that: She had called her supervisor earlier in the day to inform him that she did not have a phone. She was never provided with a phone and was left stranded at Marina Bay. She feels this was a retaliatory act for reporting the incident of sexual assault to management. She believes the acts taken against her are based on discriminatory animus on account of her sex, Female.

II.    Counter Statement of Facts and Response to Allegations of Complainant

The following paragraphs correspond numerically to those numbered paragraphs in the above section entitled *Allegations of Complainant*:

1.    Celadon acknowledges that Ms. Newell is the Complainant in this matter and that she was hired on December 11, 2000, as a security guard.

2.    Celadon acknowledges that Ms. Newell left its employ but states that she signed a separation form ("Separation Form"), a copy of which is attached hereto as Exhibit A, on May 18, 2001 and that she stated on the Separation Form that she was voluntarily resigning. She also states on the Separation Form that she has no claims against Celadon or any of its employees for any reason. Ms. Newell never stated on the Separation Form that she had been constructively discharged.

3.    Celadon denies that it discriminated against Ms. Newell on account of her being a female and as retaliation for reporting an alleged incident of sexual harassment. Ms. Newell was employed by Celadon for approximately 5 months from December 11, 2001 to May 18, 2001 when she voluntarily resigned.

KITCHIN & RILEY, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 4

4.    Celadon admits that during her employment Ms. Newell was assigned to various sites as a security guard.  Specifically, during her tenure with Celadon, she was assigned to the following locations as a security guard:

| 1 | 12/12/00 – 01/17/01 | Lena Park Community Center | Roxbury |
|---|---|---|---|
| 2 | 01/18/01 – 03/02/01 | Horizon East Condominium | Watertown |
| 3 | 03/03/01 | Contempo Casuals Retail Store | Boston |
| 4 | 03/05/01 – 03/23/01 | Horizon East Condominium | Watertown |
| 5 | 03/25/01 – 03/26/01 | One Kendall Square Construction Site | Cambridge |
| 6 | 03/26/01 – 03/30/01 | Horizon East Condominium | Watertown |
| 7 | 03/31/01 – 04/01/01 | One Kendall Square Construction Site | Cambridge |
| 8 | 04/02/01 – 04/03/01 | 24 Federal Street Office Building | Boston |
| 9 | 04/04/01 | 3 Post Office Square Office Building | Boston |
| 10 | 04/05/01 | Parkside Condo | Boston |
| 11 | 04/07/01 – 04/08/01 | One Kendall Square Construction Site | Cambridge |
| 12 | 04/09/01 – 04/13/01 | 24 Federal Street Office Building | Boston |
| 13 | 04/14/01 | 24 School Street Office Building | Boston |
| 14 | 04/15/01 | One Kendall Square Construction Site<br>Parkside Condo | Cambridge<br>Boston |
| 15 | 04/16/01 – 04/18/01 | 24 Federal Street Office Building | Boston |
| 16 | 04/19/01 | Parkside Condo | Boston |
| 17 | 04/20/01 | 24 Federal Street Office Building | Boston |
| 18 | 04/21/01 | 24 School Street Office Building<br>One Kendall Square Construction Site | Boston<br>Cambridge |
| 19 | 04/22/01 | One Kendall Square Construction Site | Cambridge |
| 20 | 04/23/01 – 04/25/01 | 24 Federal Street Office Building | Boston |
| 21 | 04/26/01 | 3 Post Office Square Office Building | Boston |
| 22 | 04/27/01 | 24 Federal Street Office Building | Boston |
| 23 | 04/28/01 | One Kendall Square Construction Site | Cambridge |
| 24 | 04/29/01 | 24 School Street Office Building<br>One Kendall Square Construction Site | Boston<br>Cambridge |
| 25 | 04/30/01 – 05/02/01 | 24 Federal Street Office Building | Boston |
| 26 | 05/03/01 | Seaport at Marina Bay Condo | Quincy |
| 27 | 05/04/01 | 24 Federal Street Office Building | Boston |
| 28 | 05/05/01 – 05/07/01 | One Kendall Square Construction Site | Cambridge |
| 29 | 05/08/01 | 24 Federal Street Office Building | Boston |
| 30 | 05/08/01 – 05/11/01 | Seaport at Marina Bay Condo | Quincy |

# KUTCHIN & RUFO, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 5

     5.     Celadon states that the date Ms. Newell suggests that she was working at One Kendall Place in Cambridge, MA as a security guard is incorrect. The relevant scheduling records reveal that Ms. Newell was assigned to provide security guard services at One Kendall Square beginning on April 29, 2001 and that her shift ran from 4 p.m. to 12 a.m. As a security guard at this location she was required to provide access-egress control. Her responsibilities did not require her to nor was she supposed to be taking a tour of the premises. The fact that she left her post was in direct violation of her job responsibilities. From its scheduling records, Celadon has determined that the only day that Ms. Newell and the alleged "foreign employee", Abedekader Kouidri were both working at One Kendall Place at the same time was on Sunday, April 29, 2001. Contrary to Ms. Newell's allegations, Mr. Kouidri was not her "supervisor". Mr. Kouidri was also a security guard employed by Celadon with responsibilities comparable to those of hers. More importantly, Mr. Kouidri was never authorized to nor, to the best of Celadon's knowledge, did he ever give Ms. Newell orders.

     As stated above, the alleged incident apparently took place on Sunday, April 29, 2001. However, Ms. Newell did not report this alleged incident to her on-site supervisor, Frank Doran, until Saturday, May 5, 2001, approximately six (6) days later. As a result of her notification of the alleged incident to her on-site supervisor, Mr. Doran filed a Disciplinary Action Report, a copy of which is attached hereto as Exhibit B, with Rodney Butler, his supervisor the next business day, Monday, May 7, 2001, describing what he had been told by Ms. Newell. Upon receiving the Disciplinary Action Report, Mr. Butler telephoned Ms. Newell to discuss the complaint. During the telephone conversation with Mr. Butler, Ms. Newell told him about the alleged incident that had transpired on Sunday, April 29, 2001 with the security officer assigned to One Kendall Square. She complained that this security officer, Abedekader Kouidri, had "brushed up against her while on tour of the premises". Mr. Butler asked her why she had waited so long to report the incident and she replied that a similar incident had happened to her while she was employed at Stop & Shop and that no action was taken by Stop & Shop. She also stated that she thought Celadon should be aware of the incident. As soon as Mr. Butler completed this telephone conversation with Ms. Newell, he reported the incident to Steven Zuchowski, who is the Vice President of Celadon and responsible for handling all employment matters. Mr. Zuchowski asked Mr. Butler to contact Ms. Newell immediately and arrange a meeting either the same day or the next day to formally inquire into and investigate the allegation. Mr. Butler contacted Ms. Newell and scheduled a meeting between the three of them for the next day. However, Ms. Newell did not show up for the meeting. As a result of her failure to show up, Mr. Butler paged her at least three times in order to inquire as to why she had failed to show up for the meeting. However, she failed to return his calls and never rescheduled the meeting.

KUTCHIN & RUFO, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 6

At the time when Ms. Newell reported the incident to Mr. Butler, Mr. Kouidri was on vacation and therefore, Celadon had planned to meet with him upon his return from vacation to discuss the incident. However, instead of returning from vacation, he picked up his last paycheck and resigned from Celadon. Therefore, Celadon never had the opportunity to confer with him about the incident. (See the Affidavits of Steven Zuchowski and Rodney Butler which are attached hereto as Exhibits C and D, respectively)

6.    As an accommodation to Ms. Newell, Mr. Butler gave her a written schedule, which she agreed to and which reassigned her to a site that she had previously worked, the Seaport Condominium at Marina Point in Quincy. Ms Newell was assigned to the Tuesday through Friday shift, which included the Friday into Saturday 5 pm to 1 am shift. Since there was no public transportation available, Celadon assigned a supervisor to pick her up prior to the end of her shift. On Saturday, May 12, 2001, the supervisor, Keith Green, drove to Seaport Condominium to pick her up at 12:40 am, approximately 20 minutes prior to the end of each shift. Mr. Green had previously picked her up prior to the end of her scheduled shift while she was at this location. However, on the night in question, Ms. Newell had already left the site when he arrived. Her conduct in leaving the site early was in direct violation of Celadon policy. On the following Monday morning, May 14, Mr. Butler read the Celadon dispatch log and contacted Ms. Newell to inquire as to why she had left her post early in direct violation of Celadon policy. She informed him that she wanted to resign. Mr. Butler asked her to come to Celadon's office in Boston so that he could talk to her about her resignation and conduct an exit interview which was standard Celadon policy. Ms. Newell came to Celadon's office on May 18, 2001 and filled out and signed the Separation Form.

III.    Celadon's Duty to Investigate and Take Prompt Remedial Action

Celadon is required to have a mechanism for a prompt, thorough, and impartial investigation into alleged harassment. The facts show that the alleged incident took place on April 29, 2001, however, Ms. Newell did not report the alleged incident to her on-site supervisor until May 5, 2001, six (6) days later. The on-site supervisor immediately filed a Disciplinary Action Report and notified his supervisor, Mr. Butler. Upon receipt of the Disciplinary Action Report the next business day, Mr. Butler discussed the alleged incident with Ms. Newell by telephone. Mr. Butler also immediately notified the Vice President of Celadon, Mr. Zuchowski. Mr. Butler then contacted Ms. Newell and scheduled a meeting for the next day to inquire into and investigate the allegation. Ms. Newell, however, did not show up for the meeting and failed to return numerous telephone calls.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 7

At the time Ms. Newell reported the incident to Mr. Butler, Mr. Kouidri was on vacation. Mr. Kouidri never returned from vacation and resigned from Celadon. Celadon, therefore, never had the opportunity to confer with him about the alleged incident.

It is clear that Celadon immediately commenced its investigation, however, the Complainant failed to cooperate with the process. Furthermore, the alleged harasser resigned from Celadon at the time the allegation was made.

## IV.    Sexual Harassment

The Courts have consistently held that an employer is not liable for sexual harassment acts of its employees if at the time the alleged harassment is brought to the attention of the employer, the employer takes prompt and effective action to cure the effects of the harassment. *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 184-185 (6th Cir. 1992); *Bennett v. Corroon & Black Corp.*, 845 F.2d 104 (5th Cir. 1988), *cert. denied*, 489 U.S. 1020 (1989). The United States Supreme court upheld and refined this rule in the cases of *Burlington Industries, Inc. v. Ellerth*, 522 U.S. __, 118 S. Ct. 2257 (1998); and *Faragher v. City of Boca Raton*, 522 U.S. __, 118 S. Ct. 2275 (1989). In those cases, the Court established that it is a complete defense to a claim of hostile work environment that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior.

In this case, Celadon took immediate and decisive action once the alleged conduct was reported. In any event, the alleged harasser never returned to work for Celadon after his vacation. This was at the time the investigation was commenced. Furthermore, it has been clearly established that Mr. Kouidri was not a supervisor, was only a security guard with responsibilities comparable to those of Ms. Newell, and was never authorized to give Ms. Newell orders.

## V.    Constructive Discharge

Ms. Newell alleges that she was constructively discharged from her employment with Celadon. This claim lacks merit since Celadon immediately initiated an investigation once it received notification from Ms. Newell of the alleged conduct. A constructive discharge occurs when the employer's conduct effectively forces an employee to resign. *GTE Products Corp. v. Stewart*, 421 Mass. 22, 34 (1995). In order to amount to a constructive discharge, adverse working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed

KUTCHIN & RUFO, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 6

intolerable. *Id.* In this case, Celadon immediately addressed the situation as set forth above.

In addition, Ms. Newell alleges that she was left stranded at Marina Bay when her shift ended at 12:00 midnight on May 11, 2001. According to her schedule, Ms. Newell's shift did not end until 1:00 a.m. on May 12, 2001. On May 12, 2001, a Celadon supervisor attempted to pick up Ms. Newell at 12:40 a.m. to give her a ride, 20 minutes prior to the end of her shift. Ms. Newell, however, had already left the site when the driver had arrived. Ms. Newell's conduct in leaving her post before her shift ended was in violation of Celadon policy.

## VI.    Hostile Work Environment and Retaliation

The retaliation provision under Chapter 151B protects those who have opposed any practice forbidden under Chapter 151B and those who file complaints or assist in any proceeding before the Massachusetts Commission Against Discrimination. Mass. Gen. L. c. 151B § 4(4) states that it shall be an unlawful practice:

> 4.    For any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden under this chapter or because he has filed a complaint, testified or assisted in any proceeding under section five.

As set forth above, Ms. Newell alleges she was left stranded at Marina Bay when her shift ended at 12:00 midnight on May 11, 2001, and that such conduct by Celadon was a retaliatory act for reporting the alleged sexual assault incident. The retaliation claim, however, must fail because Celadon has shown that it attempted to pick Ms. Newell up at the end of her shift, but she had left her position prior to the end of her shift.

## VII.    Gender Discrimination

Although it is not clear, Ms. Newell appears to set forth a claim of discrimination against Celadon based upon gender. In an employment discrimination case alleging disparate treatment, the plaintiff bears the initial burden of establishing a prima facia case of discrimination. *Matthews v. Ocean Spray Cranberries, Inc.,* 426 Mass. 122, 128 (1997), citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973); *Blare v. Husky Injection Molding Sys. Boston, Inc.,* 419 Mass. 437, 439 (1995); *Wheelock College v. Massachusetts Comm'n Against Discrimination,* 371 Mass. 130, 138 (1976). Once the plaintiff meets this burden, unlawful discrimination is presumed and the burden then

# KUTCHIN & RUFO, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 9

shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its decision, and to produce credible evidence to show that the reason advanced was the real reason. *Id.* Once the defendant meets its burden, the presumption of discrimination vanishes, and the burden returns to the plaintiff to show that the defendant's proffered reason for its employment decision was not the real reason, but was a pretext for discrimination. *Id.* If the defendant's reasons are not discriminatory and the plaintiff cannot prove that there are pretexts, the plaintiff cannot prevail. *Matthews,* 426 Mass. at 128.

Ms. Newell has failed to set forth a claim of discrimination against Celadon based upon gender. In her Complaint she only states that she was discriminated against because of her gender, and retaliated against for reporting an incident of sexual harassment. The only facts alleged by Ms. Newell relate to the alleged sexual assault and the incident at Marina Bay. The alleged sexual assault incident was immediately addressed by Celadon as stated above, and the retaliation claim can be dismissed also based upon Celadon's response as set forth above. A claim for gender discrimination, therefore, must be denied since Ms. Newell has failed to establish a prima facia case of discrimination.

VIII.   General Defenses Asserted by Celadon.

      1.   Ms. Newell failed to establish a prima facie case with respect to the claims made.

      2.   Celadon complied with all laws and regulations and has otherwise satisfied its statutory obligations towards Ms. Newell.

      3.   Ms. Newell is barred by the doctrines of estoppel and waiver.

      4.   All company policies existing at the time of Ms. Newell's employment are lawful, valid and fully enforceable.

      5.   Ms. Newell voluntarily quit for reasons other than as set forth in her claims.

      6.   Celadon reserves its right to a jury trial.

IX.   Conclusion

After review of the above detailed response, it should be apparent to the Commission that the allegations set forth in Ms. Newell's Complaint are totally frivolous, asserted in bad faith and not supported by any evidence. Celadon fulfilled all of its

## KUTCHIN & RUFO, P.C.

Jeannine Rice, Investigator
Massachusetts Commission
Against Discrimination
July 20, 2001
Page 10

obligations under the law, in a proper and timely fashion, adequately investigated and addressed Ms. Newell's allegations, and did not discriminate against Ms. Newell. For all of the reasons mentioned herein, Celadon denies each and every allegation of discrimination and requests that the Commission find lack of probable cause and dismiss the Complaint.

Very truly yours,

Edward D. Kutchin

EDK/tb
Enclosures

cc:    Francis E. Kenney, President
         Celadon Security Services (w/enc.)
         Mary Newell (w/enc.)

F:/3687/Pleadings/Position1.doc

## Affirmation

I, Francis E. Kenney, President of Celadon Security Services, Inc., hereby certify and affirm, under oath and the pains and penalties of perjury, that I have reviewed this Position Statement and that the factual allegations set forth therein are true and those being set forth upon information and belief are true to the best of my present information and belief.

Celadon Security Services, Inc.

By: _____
Francis Kenney, President

July 20, 2001

## MASSACHUSETTS COMMISSION AGAINST DISCRIMINATION

**SUFFOLK, SS:**

In Re:    Mary Newell
          v. Celadon Security Services Inc.
          Docket No. 01131482

### AFFIDAVIT OF STEVEN ZUCHOWSKI

I, Steven Zuchowski, do depose and say as follows:

1.      My name is Steven Zuchowski and I am over the age of 18 and believe in the obligations of an oath. I have worked for Celadon Security Services Inc. for approximately 2 years as Vice President.

2.      I make this affidavit on personal knowledge of the facts contained herein.

3.      Mary Newell was employed by Celadon Security Services, Inc. from December of 2000 until she resigned on May 18, 2001.

4.      In accordance with Celadon practice, Ms. Newell was assigned to Account Manager Rodney Butler for training and site assignment.

5.      During the second week of May, 2001, Mr. Butler reported to me that Ms. Newell had reported to him an incident that occurred at One Kendall Square, Cambridge, MA on May 1, 2001. Mr. Butler informed me that Ms. Newell alleged that security officer Abedekader Kouidri had brushed up against her in an inappropriate manner.

6.      I asked Mr. Butler to contact Ms. Newell immediately and arrange a meeting either the same day or the next day to formally inquire into the allegation. Mr. Butler contacted Ms. Newell and arranged for a meeting for the next day. Ms. Newell did not show up for the meeting.

7.      When I asked about the status of Mr. Kouidri's employment with Celadon, Mr. Butler informed me that he had removed himself from the work schedule prior to the incident report by Ms. Newell.

8.      I asked Mr. Butler on May 14, 2001, if Ms. Newell would be rescheduling our meeting as I wished to conduct an investigation into the allegation. Mr. Butler told me that he was not sure if Ms. Newell wanted to meet with me. He also informed me that he had reassigned her to the Seaport Condominiums at Marina Bay, Quincy, a first class condominium complex.

**EXHIBIT**

E

9.    Mr. Butler told me that Ms. Newell voluntarily resigned from Celadon's employ on May 18, 2001 and that she did not mention the alleged sexual harassment incident during the meeting nor did she want to reschedule the meeting she missed.

SUBSCRIBED TO AND SWORN TO UNDER THE PAINS AND PENALTIES OF

PERJURY THIS _20ᵗʰ_ DAY OF _July_, 2001

_Steven Zuchowski_

Steven Zuchowski

F:\3687\Pleadings\AffidavitSteveZuchowski.doc

# CELADON COMPANIES
## SEPARATION FORM

$125.0

NAME  X ABDELKADER KOUIORI    DATE  X 08/21/04

I am leaving the company for the following reason

1. Resignation  A K    2. Termination _____

3. Other: _____

I have given the company the following Notice:

1. No notice  A K    2. Two weeks _____

3. Other _____

I have returned all equipment and uniforms and received my last paycheck?

1 Yes  A , K    2. No _____

I have received my DET pamphlet which outlines my rights:

1. Yes  K A    2. No _____

I elect to remain on the company sponsored Health plan as mandated by COBRA.

1. Yes _____    2. No  A . K

I would rate Celadon as:

1. Excellent _____    2. Good  A . K

3. Average _____    3. Poor _____

I have no claims against Celadon or any of its employees, If I answer Yes then I must explain in writing to allow Celadon to rectify any valid claim. Failure to complete this form will nullify any further claims against Celadon

1. Yes _____    Reason _____

_____

_____

_____

_____

2. No  A . K

I authorize Celadon to release my employment information to any Government agency or future prospective employer

1. Yes  A . K    2. No _____

X Kouiori Abdl  X 05/21/04

SIGNATURE            DATE

### CELADON USE ONLY

MANAGER  R Butta

NOTIFIED PAYROLL  ✓

TRAINING SHEET _____

UNIFORMS RETURNED  ✓

BADGES RETURNED  ✓

TELEPHONE BOOK  ✓

### REFERENCE:

GOOD _____    POOR  ✓    NOT ELIGIBLE FOR REHIRE  ✓

EXHIBIT

F

C127

# CSSI
## CELADON SERVICE GROUP DISPATCH LOG

Day Saturday          Date: 5/12/01          Shift: 7a - 3p

| TIME | NAME | REMARKS |
|---|---|---|
| 07.30 | K. Baxter | Called with question for Jim B. (617)288-0282 |
| | Advanced Alarm | #16- Two Newton. ___ letting ___ door in motion ___ |
| NOTE — | | Will try to reach M. Newell and D. Westfield and will notify Rodney and Mark of the situations. |
| Note - Bruce | | Do we know where the laptop is? |
| 0900 | Jumper | D. Yermakov on duty |
| 0920 | A. Dorellus | Called stating he didn't receive his check. Very upset, wants Mark to call him. (617) 427-2548 |
| 1015 | Seaport | Property manager Laurie Hayme call re: incident last night with M. Newell. Laurie feels bad that s/o phone is broken and wants M. Newell to know there will be a new one tonight. Notified Rodney who will call Newell. |
| 10.30 | T. Otero | On duty training for dispatch |
| 1200 | A. Charles | Not on duty at filene's. Sending jumper |
| 1230 | A. Charles | At filene's. claims he was there on time. Store security said different |
| 1300 | Jumper | D. Yermakov off duty |
| 1500 | Burns | Off duty |

EXHIBIT
tabbies'
C369